YUNKER v. NICHOLS.

EASEMENT — *right to convey water over land for irrigation.*   In this territory lands are held in subordination to the dominant right of others, who must necessarily pass over them to obtain a supply of water to irrigate their own lands.

*May exist without grant or prescription.*   A right to convey water over the land of another for the purpose of irrigating one's land may be acquired under the statute (Rev. Stat. 363), and such right needs not a grant from the owner of the servient estate to support it.

| 1  | 551 |
|----|-----|
| 4  | 104 |
| 4  | 109 |
| 8  | 413 |
| 10 | 445 |

| 1  | 551 |
|----|-----|
| 12 | 531 |

| 1  | 551 |
|----|-----|
| 18 | 150 |

| 1  | 551 |
|----|-----|
| 22 | 246 |

| 1   | 551 |
|-----|-----|
| 9a  | 134 |
| 9a  | 135 |
| 9a  | 137 |

| 1   | 551 |
|-----|-----|
| 15a | 193 |

| 1  | 551 |
|----|-----|
| 36 | 151 |

*Error to District Court, Arapahoe County.*

YUNKER brought an action of trespass on the case against Nichols, for diverting water from an irrigating ditch leading from Bear Creek to the plaintiff's farm. It appeared that the ditch was constructed in the spring of the year 1871, by the plaintiff, the defendant and one John Bell, under an agreement that they would share equally in the water conveyed thereby, such water to be used in irrigating the lands of the several parties respectively. After the ditch had been constructed to and across the defendant's land, so as to communicate and supply water to plaintiff's land, the defendant diverted the water from the ditch and caused the same to flow upon his own land, so that none passed down to the plaintiff, whose lands were below those of the defendant, by means whereof the plaintiff's growing crop was greatly injured and diminished in value. It did not appear that there was any memorandum in writing of the agreement in respect to the ditch betwen the plaintiff, the defendant and Bell. The court instructed the jury that, if the plaintiff's right to have water flow over the lands of the defendant was conferred by verbal agreement of the plaintiff, the defendant and a third person, which agreement was never reduced to writing, that the plaintiff could not recover. The jury found for the defendant.

Mr. H. R. HUNT, for plaintiff in error.

Messrs. BROWNE & PUTNAM, for defendant in error.

Separate opinions were filed by the members of the court.

HALLETT, C. J. In England, and in this country, it is considered that the right of one person to conduct water over the land of another is an interest in real estate, which must be conveyed by deed in compliance with the terms of the statute of frauds. In countries where the humidity of the climate is sufficient to supply moisture to plants, there can be no reason for distinguishing this from other ease-

ments in the soil, and therefore the law of England, and of most of our States on this point will be found in the general rules relating to real property.

The principles of the law are undoubtedly of universal application, but some latitude of construction must be allowed to meet the various conditions of life in different countries. The principles of the decalogue may be applied to the conduct of men in every country and clime, but rules respecting the tenure of property must yield to the physical laws of nature, whenever such laws exert a controlling influence.

In a dry and thirsty land it is necessary to divert the waters of streams from their natural channels, in order to obtain the fruits of the soil, and this necessity is so universal and imperious that it claims recognition of the law. The value and usefulness of agricultural lands, in this territory, depend upon the supply of water for irrigation, and this can only be obtained by constructing artificial channels through which it may flow over adjacent lands. These artificial channels are often of great length, and rarely within the lands of a single proprietor. A riparian owner must usually get his supply of water from some point on the stream above his own land, and he is compelled to enter upon the lands of others in order to obtain it. Irrigating ditches cannot be made available at or near the head or point of divergence from the stream, and, while a riparian owner may be able to construct a ditch upon his own territory which shall overflow a portion of his land, he can never make it serviceable to the entire tract. Of course, lands situated at a distance from a stream cannot be irrigated without passing over intermediate lands, and thus all tilled lands, wherever situated, are subject to the same necessity. In other lands, where the rain falls upon the just and the unjust, this necessity is unknown, and is not recognized by the law. But here the law has made provision for this necessity, by withholding from the land-owner the absolute dominion of his estate, which would enable him to deny the right of others to enter upon it for the purpose of ob-

taining needed supplies of water. It was enacted by the first legislative assembly, that persons owning claims on the bank, margin or neighborhood of any stream, should have the right of way over adjacent lands for purposes of irrigation (Laws 1861, p. 67), and this law is still of force. (Rev. Stat. 363.) So, also, the common law recognizes an easement in certain cases, and will imply a grant of such easement where it is especially necessary to the enjoyment of the dominant estate. Phear on Rights of Water, 71.

If one having a close, surrounded with his own land, grants the close to another in fee for life or years, the grantee shall have a way to the close over the grantor's land as incident to the grant, for, without it, he cannot derive any benefit from the grant. So it is, also, where he grants the land and reserves the close to himself. 1 Wm. Saund. 323, note 6: *Pennington* v. *Galland*, 9 Ex. 9; *Snyder* v. *Warford*, 11 Mo. 513.

And if one erect a house and build a conduit thereto in another part of his land, and convey water by pipes to the house, and, afterward, sell the house with the appurtenances, excepting the land, or sell the land to another, reserving to himself the house, the conduit and pipes pass with the house, because it is *necessary* and *quasi* appendant thereto. Phear on Rights of Water, 72; *Pheysey* v. *Vicary*, 16 M. & W. 484; *Ryer* v. *Carter*, 1 H. & N. 916. In these cases, it is true, the dominant and servient estates were derived from a common source, but in this they are analogous to the case at bar. All the lands in this territory which are now held by individuals were derived from the general government, and it is fair to presume that the government intended to convey to the citizens the necessary means to make them fruitful.

"Into all contracts, whether made between States and individuals or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself. They are superinduced by the pre-existing and higher authority of the laws of nature, of nations, or of the community to which the parties belong. They are

always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force." *West River Bridge Co.* v. *Dix,* 6 How. 532.

When the lands of this territory were derived from the general government, they were subject to the law of nature, which holds them barren until awakened to fertility by nourishing streams of water, and the purchasers could have no benefit from the grant without the right to irrigate them. It may be said, that all lands are held in subordination to the dominant right of others, who must necessarily pass over them to obtain a supply of water to irrigate their own lands, and this servitude arises, not by grant, but by operation of law.

In this case there was evidence tending to prove that defendant consented to the construction of the ditch, which, with the aid of the law, was sufficient to maintain the action. If defendant had refused his consent, the statute prescribed the method of proceeding to perfect plaintiff's right. But, in any event, it was not necessary that defendant should convey to plaintiff the right of way for the ditch, and therefore the charge to the jury was erroneous.

I think that the judgment should be reversed, and that a new trial should be awarded.

BELFORD, J.   Yunker sued Nichols in the court below, in an action on the case to recover damages for cutting a certain ditch which had theretofore been constructed on Nichols' land, and for diverting the water therefrom. The declaration contains three counts. It is averred that Yunker, at the commencement of this action, and for a long time anterior thereto, was the owner of a certain tract of land lying from one to two miles distant from a certain stream known as Bear Creek. It is further averred that plaintiff had no facilities on said land for irrigating purposes. It is further alleged that the defendant and one John Bell, John McBroom and Peter Olsen, respectively, claimed cer-

tain tracts of land lying between the land of the plaintiff and the stream above mentioned. That, on the first day of March, 1871, the plaintiff and the said defendant and Bell, not having water facilities on their lands for the purpose of irrigation, built and constructed a dam in said stream of water, adjacent to the land of McBroom, and procured from McBroom and Olsen the right of way across their land, and dug and constructed a certain ditch, and conducted water therein from the dam to the respective lands of Bell and Nichols and the said plaintiff, for the purpose of using the same in irrigating and making said lands available for agricultural purposes. That, by mutual agreement, the water running through the ditch was to be used share and share alike by the parties, each of the parties having the right to divert from said ditch on to their respective tracts one-third of the water. It is further alleged that, notwithstanding this agreement, and after the ditch was constructed and the water let in, the defendant wrongfully and unjustly intending to injure the plaintiff and deprive him of the use of the water not only diverted a larger quantity of it than he was entitled to, but prevented any portion of it from reaching plaintiff's land and prevented the plaintiff from using the ditch, wherefore great damage had accrued, etc. The defendant filed the general denial. The cause was submitted to the jury for trial, who returned a verdict for the defendant. There was no evidence introduced on the part of the defendant, and that of the plaintiff fully sustained the allegations of the declaration. The court gave the jury the following instructions, which are assigned for error :

"If the jury believe, from the evidence, that the right to have water flow over the lands of the defendant and to the lands of the plaintiff, for the interruption of which this action is brought, was conferred by a verbal agreement of the parties or the verbal agreement of the plaintiff and defendant and a third person, which agreement was never reduced to writing, and that the plaintiff had no other right to such flow of water than such verbal agreement ; then,

although they should believe from the evidence that the plaintiff actually constructed said ditch, and expended labor and money on the faith of such agreement, and that the defendants actually diverted the water, as charged in the declaration, they must find defendant not guilty."

"The jury cannot find for the plaintiff unless they believe from the evidence that the right which plaintiff claims to have water flow over the land of defendant, and for the obstruction of which right this action is brought, was given by deed of the defendant to plaintiff. If plaintiff's only title to the flow and use of the water was a verbal agreement or consent of the defendant, the plaintiff has no case."

The principle involved in this case has certainly received a large degree of attention, both in this country and in England, and it is to be deeply regretted that those courts which appear to have given it the greatest consideration have failed to preserve any rule of uniformity in their decisions. A broad distinction seems to be taken between a license which is executory, and one that has been executed, and, in many instances, the principle of estoppel has been made available in avoiding the recognized force of the statute of frauds. In some of the States a license to dig a ditch and flow water therein over the land of another is held not to be such an interest in the realty as requires the right to be evidenced by deed; in others, a contrary rule is expressly announced, and licenses of this character are held to be always revocable at the will of the licensor. I apprehend that much of the confusion which obtains on this subject arises from a failure to keep steadily in view the distinction which unquestionably exists between a mere license and a grant. In speaking of this subject, VAUGHAN, C. J., says: "A dispensation or license properly passeth no interest, nor alters or transfers property in any thing, but only makes an action lawful which, without it, had been unlawful. As a license to go beyond the seas, to hunt in a man's park, to come into his house, are only actions which, without license, had been unlawful. But a license

to hunt in a man's park, and carry away the deer killed to his own use; to cut down a tree in a man's ground, and to carry it away the next day after to his own use, are licenses as to acts of hunting and cutting down the tree, but as to carrying away of the deer killed and the tree cut down, they are *grants*."

In courts where this distinction has been taken, it has been held that the right to overflow the land of another is an easement, an incoporeal hereditament, and it is an interest in real estate. Title to such easement must be conveyed by grant and established by proof of an actual grant, or by proof of a prescription, from which a grant will be inferred. And if the mode of proof adopted be the showing of an actual grant, the grant must, at least, under the statute of frauds, be in writing, by deed; and the same doctrine has been specially applied to a ditch constructed through the land of another. *Morse* v. *Copeland*, 2 Gray, 305; *Selden* v. *Delaware and Hudson Canal Co.*, 29 N. Y. 635; *Foster* v. *Browning*, 4 R. I. 47; *Foster* v. *N. H. and N. Co.*, 23 Conn. 228. Our attention, however, has been particularly called to the decisions which have been made on this subject in Maine, New Hampshire, Ohio, Iowa and Indiana, and I have endeavored to give them a most careful and critical examination. *Ricker* v. *Kelly*, 1 Greenl. 117, was an action of trespass for cutting down and destroying part of a wooden bridge, the property of the plaintiffs. The defendant, in justifying, pleaded that the bridge was erected on the land of Kelly without his license and against his will, and that he removed it, as he lawfully might do.

The plaintiffs replied that, on a certain day, in consideration of their promise to perform certain work, which was accordingly performed for Kelly, he gave them a license and authority to erect a bridge on his land, and to have a right of way over the same to the bridge; that, by virtue of said license, they erected the bridge, etc. To this replication the defendants demurred, because the plaintiffs had not set out any legal conveyance of title to them to build their

bridge, nor to enter upon or pass over the land for any other purpose, and because it did not appear that said license was in writing, nor how long it was to continue in force. *Held* by the court, that the replication was good and the action maintainable. MELLEN, C. J., after referring to the allegation of the defendant, that the claim of the plaintiffs was an interest in the close within the meaning of the statute of frauds, and the proof of *this interest* not being in writing, the permission of the defendant to the plaintiffs to enter upon the close and build said bridge and enjoy a right of way over the close to the said bridge, is void and ineffectual, says : " In the present case the plaintiffs placed their own materials in the form of part of a bridge on the defendant's land, by their express consent, and if a right of way over the close to the bridge did not pass by parol, *still the defendant had no right* to seize and carry away the plaintiff's property and destroy its value. As well might the owner of a ship-yard permit another to build a ship in it, and when the ship was on the stocks, cut it in pieces and carry it away with impunity," and this really appears to be the controlling principle in that decision. True, the judge holds that the permission having been acted upon, the case was thereby taken out of the operation of the statute of frauds. But if we concede that this decision is made to rest on this latter ground, then the case can no longer be regarded as authority in that State, for the reason that *Pitman* v. *Poor*, 38 Me. 237, silently overrules it, and holds that no permanent interest in real estate can be acquired by a parol agreement, and that the parol license that the plaintiff or his grantor may build a dam on the land of another, to raise a reservoir of water for the use of his mill, will confer no right upon the plaintiff to maintain such dam after it is built, or control the water raised by means of it. This is the last utterance on the subject by that court, so far as I am informed, and must be taken as the established doctrine of that State.

The first case in New Hampshire is that of *Woodbury* v. *Parshley*, 7 N. H. 237. That was an action on the case

The declaration alleged that the plaintiff was seized of a meadow adjoining a certain pond, and that the defendant, by means of a dam erected by him upon his own land, caused the water to overflow and injure the meadow of the plaintiff. The defendant introduced evidence showing that the dam had been erected by the mutual agreement of the parties. The plaintiff objected to the admission of parol evidence to prove such agreement, but the evidence was admitted. The court, after holding that the evidence was rightly admitted, says : "The dam was erected by the defendant at his own expense, with the assent of the plain-tiff, for the benefit of both. And here the first question is, whether, under the circumstances, the license was revocable at the will of the plaintiff? The defendant had incurred expenses in erecting the dam. The license had been exe-cuted and acted upon. Certainly the plaintiff could not revoke it without tendering to the defendant the expenses that had been incurred in the project."

In *Ameriscoggin Bridge* v. *Bragg*, 11 N. H. 108, the court say : "It is contended further, that the license to erect a bridge on defendant's land cannot be shown by parol testi-mony, on the ground that it is a permanent easement in the land, with a right at all times to enter and enjoy it, and that such an easement is within the statute of frauds, and can be sustained only by evidence in writing. The distinction between a privilege or easement carrying an interest in land and requiring a writing within the statute of frauds to sup-port it, and a license which may be by parol is said, by Chancellor KENT, to be quite subtle, and that it is difficult in some of the cases to discern a substantial difference between them. A license to an individual to do an act ben-eficial to him, but requiring an expenditure upon another's land, is held not to be revocable after it has once been acted upon. Such a license is a direct encouragement to expend money, and it would be against conscience to revoke it as soon as the expenditure begins to be beneficial." In *Samp-son* v. *Burnside*, 13 N. H. 264, it is held that a parol license to enter on land and lay down aqueduct logs for the pur-

pose of carrying water from a spring to adjoining land, with license to enter from time to time to examine and repair the same, is not a sale of land or an interest in land within the statute of frauds. Whether the license in such a case is revocable or not, is regarded as an open question. In the case of *Houston* v. *Laffer*, 46 N. H. 507, which very strongly resembles the case at bar, the earlier decisions on this subject in that State are all noticed, and, if not directly overruled, their authority is greatly impaired. After alluding to these cases the court say : "But we think the more recent decisions, however, sustain the doctrine that the license is, in all cases, revocable, so far as it remains unexecuted, *or so far as any future enjoyment* of the easement is concerned. To hold otherwise would be giving to a parol license the force of a conveyance of a permanent easement in real estate ; such a doctrine cannot be sustained. No such right or interest in real estate can be created by parol." It is evident, therefore, from the later cases, both in Maine and New Hampshire, that a clear departure has been taken from the doctrines announced in the earlier reports, and a tendency has set in to conform to the line of decision pursued in a majority of the States. In Ohio the court has steadily adhered to the doctrine that a parol license, when executed, is irrevocable, and that an action of trespass is maintainable against the licensor for any unjust interference with the rights of the licensee. *Wilson* v. *Chalfant*, 15 Ohio, .

In Iowa, *Wickersham* v. *Orr*, 9 Iowa, 260, the irrevocability of an executed parol license is made to rest on the ground that when money or labor has been expended on the land of another, upon the faith of a promise given by him, the owner shall not assert his legal right to the soil so as to interfere with that use or enjoyment of the thing which has resulted from such promise by the money and labor of the licensee.

In *Bently* v. *Gregory*, 17 Iowa, , it is held that a parol license which has been acted upon, and which has led to the expenditure of money and labor, cannot be revoked until compensation for such expenditure has been made. Taking

this last case as modifying the principle announced in the former, we have the courts of two States, Ohio and Pennsylvania, adhering strictly to the doctrine of the irrevocability of an executed license, while in all the other States, as well as in England (*Wood* v. *Leadbetter*, 13 M. & W.   ), licenses of this character are held to be revocable at will, as being in contravention of the statute of frauds.   Viewing the instructions given by the judge below, to the jury, as the announcement of doctrines which should govern a court of law in the administration of purely legal principles, I am not prepared to dissent from them, but, while I yield to them that measure of homage so fully accorded by others, I cannot shut my eyes to the fact that it is doing violence to every principle of justice, to allow a statute designedly passed to cut off and prevent frauds, to be converted into an instrument whereby they may be practiced and fostered.   That which was originally intended as a shield and defense for rights should never be permitted to become a means of assault for their overthrow.   Courts of equity which constantly adapt themselves to the progress of society and civilization, and whose principles accumulate with the experience of ages, have certainly blunted the sharper edges of the statute of frauds, and evolved a doctrine in every respect more consonant with the interest of society, namely, that he who by his admissions or conduct induces another to act, cannot afterward be permitted to assert the contrary to the injury or prejudice of the party who has already acted upon the faith and in the belief created by him ; and all the courts concur in holding that an estoppel *in pais* exists, when a party makes a statement to another, which that other relies and acts upon, and which it would be a fraud in the party making the statement to afterward controvert, so far as the statement affects the other's pecuniary rights.   It cannot be denied that the common law has, in a great measure, accommodated itself to this doctrine of estoppel, especially so far as it affects personal property, and its application in matters of that nature is constant ; nor is it wanting in examples in relation to real estate.   So great a jurist as Lord MANSFIELD

would not suffer a man to recover even in ejectment, when he had stood by and seen the defendant build on his land. And, in the case of *Hearn* v. *Rogers*, 9 B. & C. 577, Mr. Justice BAILEY said, that under the same circumstances he would apply the same doctrine. Mr. Justice BULLER, in the case of *Farr* v. *Newman*, 4 D. & E. 636, remarks : "That when a rule of property is settled in a court of equity, and there are no decisions against it at law, I am as ready as any man to follow the line of equity, for I think it absurd and injurious to the community, that different rules should prevail in different courts on the same subject." And to the same effect is the language of Lord ELDEN in *Smith* v. *Doe*, 7 Price, 509. In the case of *Shaw* v. *Bebee*, 35 Vt. 208, the principle of estoppel was applied. That was an action of ejectment. The court say, "We are aware that there have been decisions questioning the extension of this doctrine of estoppel *in pais* to affect the title to lands. But a review of the decisions shows that the great weight of authority is consonant with the views we have here expressed. All concur that such facts constitute an estoppel as to personal property, and upon reason and principle to prevent fraud and promote justice the same rule should be extended to real property." It is also true, that the common-law courts of Pennsylvania have adopted it ; and they have adopted many other principles which had first received their sanction in courts of equity. *Wents* v. *De Haven*, 1 Serg. & Rawle, 312. The same principle was applied in *Corbet* v. *Norcron*, 35 N. H. 115, and in *Heard* v. *Hall*, 16 Pick. 457, and in *White* v. *Perkins*, 24 id. 324.

In the State of Nevada they have yielded to the force of the same doctrine, as will be seen from the case of *Sharan* v. *Mennick*, 6 Nev. 389 ; so also in California. *Kelly* v. *Taylor*, 23 Cal. 11 ; 5 id. 84, and 8 id. 44.

In *Snowdon* v. *Wilds*, 19 Ind. 14, the court say : "But though a parol license amounting, in terms, to an easement, is revocable as to future enjoyment at law, and is determined by a conveyance of the estate upon which it was enjoyed, this is not the rule in all cases, in courts of equity. In these

courts the future enjoyment of an executed parol license, granted upon a consideration, or upon the faith of which money has been expended, will be enforced, at all events when adequate compensation in damages could not be obtained. This will be done upon the two grounds of estoppel and fraud, and the specific performance of a partly executed contract to prevent fraud. And in those States where law and equity are administered in the same court, relief is afforded in any given suit when the pleadings present the necessary averments." When courts of law so freely apply this principle, in regard to personalty, it is difficult to comprehend why any hesitation should exist in its application to real estate. What would be justice in one case would be equally so in the other; and in equity it is accordingly admitted, and why should it not be so at common law. It may be said, however, that the distinction between law and equity is maintained in this territory. That is true only in a qualified sense. The same officer administers both, and at the same term of court, and *to me it seems strange and preposterous for the same judge to turn the party out of his court one day to enable him to avail himself of a well-known, well-defined and well-settled rule in jurisprudence, as applicable in a rational point of view to proceedings in one tribunal as in those of another, especially when, as in this territory, the very court which is to decide in equity is the same tribunal.* It cannot be controverted that, under the facts set forth in the declaration, Yunker would be entitled, in a court of equity, to a remedy, that would secure him in the enjoyment of the ditch and the water flowing therein. Would a court of equity also compensate him for the damages which he has sustained by reason of the unjust interference of Nichols? then it would be invading the domain of the law, and setting itself up as the admeasurer of damages; a comfortable and assuring spectacle indeed, when the same judge had, the day before, declined, for reasons of grave public policy, to invade the domain of equity. If the court should, however, feel unable to award compensatory damages, Yunker would be remediless, for the affirmance of the

judgment below would bar his right of action, although the deed which the court of equity would require Nichols to make might be adjudged to take effect from the date of the construction of the ditch.

In the notes to Smith's Leading Cases, vol. 2, p. 762 (6th Am. ed.), the learned annotators say : "It would, therefore, seem too late to contend that the title to real estate cannot be barred by matter *in pais* without disregarding the statute of frauds, and the only room for dispute is as to the forum in which relief must be sought. The remedy in such cases lay originally in chancery, and no redress could be had in the courts of common law unless under rare and exceptional cases. But the common law has been enlarged and enriched with the principles and maxims of equity, which are constantly applied at the present day in this country and in England for the relief of sureties, the protection of mortgagors and the benefit of purchasers by a wise adaption of ancient forms to the more liberal spirit of modern times. The doctrine of equitable estoppel is derived from the courts of equity, and as those courts apply to every species of property, there would seem no reason why its application should be restricted in courts of law. Protection against fraud is equally necessary, whatever be the nature of the interest at stake, and it would seem that, whether the controversy be in equity or at law, there is nothing in the nature of real estate which should deprive it of the benefit of those wise and salutary principles which are now applied without scruple, in both jurisdictions, in case of personalty. And whatever may be the wisdom of the change which has broken the barriers by which the doctrine of equitable estoppel was formerly excluded from legal tribunals, it has now gone too far to be confined within any limits less than the whole field of jurisprudence." *Buckholler* v. *Edwards*, 16 Ga. 593.

It seems to me, after the doctrine has received the sanction of such courts as those of Maine, New Hampshire, Pennsylvania, Georgia, Ohio, Indiana, Iowa, Nevada and California, we can run no serious risk in applying its bene-

fits to the property within our borders. If the foregoing views are in any measure open to objection, still another reason exists which imperatively demands the reversal of the judgment below. At an early period in our territorial history, the legislature, keenly alive to the wants and necessities of our people, enacted a law on the subject of irrigation, the provisions of which were designed to secure to all persons who claim, own or hold a possessory right or title to land within the boundary of Colorado, when those claims are on the bank, margin or neighborhood of any stream of water, the use of the water of said stream for the purposes of irrigation and making said claims available, to the full extent of the soil, for agricultural purposes. And further providing that, when the land so held or owned is removed from said stream of water, the owner or claimant shall be entitled to a right of way through the farms or tracts of land, which lie above and below him on said stream, for the purposes above stated. The constitutionality of this law is, however, assailed, and it becomes necessary to pass upon it. To avoid acknowledging the fact that constitutions, sometimes surrender to the force of necessity, the general opinion obtains that courts and legislatures are justified in presuming that, within the scope and spirit of wise, august instruments, every power may be found, the exercise of which is essential to the public welfare.

If the warrant for performing an act, justly esteemed indispensable to the public prosperity, is not found in an express grant, then the authority finds lodgment in the implied powers of the constitution ; for whenever the end is required the means are authorized, and whenever a general power to do a thing is given, every particular power necessary for doing it is included. It would be almost impracticable, if it were not useless, to enumerate the various instances in which congress, in the progress of the government, has made use of incidental and implied means to execute its powers. They are almost infinitely varied in their ramification and details. 2 Story on Const., § 1258. One of the most important interests of this territory is the

agricultural interest. This can only be fostered and nourished by a system of irrigation, and the right to legislate on this subject seems to me clear and unquestionable. If, then, the agriculture is essential to the well-being of this territory, and can only be developed by a system of irrigation, it seems to me a matter of absolute necessity, that the legislature should have power to pass needful laws whereby the great body of land lying within our boundaries should be made available — and that necessity confers a right to pass such laws, I will endeavor to demonstrate. No such power as that of selling lands for the non-payment of taxes is to be found in the revealed, natural, civil or common law. But there are analogous powers to be found in the common-law code and in the statute law of every civilized nation; for example, the power to condemn land for public uses, and the other cases where power is exercised over the estates of citizens, such as the sale of lands for the payment of the debts of owner. The taxing power has no existence in a state of nature. It is the creature of civil society, government begets its necessity. There must be interwoven in the frame of every government a general power of taxation. Money is with propriety considered as the vital principle of the body politic, as that which sustains its life and motion and enables it to perform its most essential functions. A complete power, therefore, to procure a regular and adequate supply of revenue, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution. From a deficiency in this particular, one of two evils must necessarily ensue: either the people must be subjected to continual plunder or the government must perish for want of revenue to support it. It may, therefore, be laid down as a principle of universal constitutional law, that the power to levy taxes is an incident to sovereignty, without which no government could exercise the powers expressly delegated to it. Blackwell on Tax Titles, 8-39; *Pasham* v. *Decatur County*, 9 Ga. 352.

If, therefore, the right to raise revenue and to sell land

for the payment of taxes are made legal and constitutional by virtue of the necessities of society and government, what tenable objection can be made to the validity of a law, which, taking note of an imposing public necessity and the physical conditions of our territory, accords to all persons engaged in agricultural pursuits a right of way over lands lying between their possessions and a stream of water.

Is not the necessity in this particular instance quite as imperative as in the other?

Every member of society is presumed to have assented to the public law by which his right of property is subjected to the dominion of strangers. The manner in which this power is to be exercised is specified in the law. The same law which creates this power bridles its execution. You may take my property to pay my debts, but you must ascertain that debt by judgment and a sheriff must execute the power. You may take my land to build a railroad, but you must pay me the value of it. And hence, while it may justly be said that a party has an unquestionable right, owing to the necessities of the country, to construct a ditch over the land of another, independent of any special law on the subject, yet the legislature, as the representative of that society into which each citizen enters, and in the entering of which he sacrifices so much of his rights for the purchase of social protection, may prescribe the method, terms and means whereby that right to construct the ditch shall be exercised. Of course these legislative provisions may be waived by the parties, as was done in this case. The construction of a ditch for irrigating purposes seems to me to rest on principles analogous to those which sustain the right of a private way over the land of another.

In *Parker* v. *Webster*, 2 Sid. 39, decided in Cromwell's time, it appeared that A had three parcels of land and there was a private way out of the first parcel to the second and out of the two first parcels to the third, and B purchased all these parcels and sold the two first to C. There was no way to the land not sold but through the other two parcels, and the court adjudged that the way continued from neces-

sity, and that the party was not liable in trespass for using it. In the case of *Snyder* v. *Warford*, 11 Miss. 513, the court held that a right of way of necessity exists in all cases in which an individual owns land surrounded by other lands excluding it from any public highway, and the case is made to rest upon the good and salutary principle that the right of a man in the use of his property is restricted by a due regard to the equal rights of others. The judge says : " It would seem to be no more than a principle of natural justice that his right of way should exist, although its existence may, to some extent, interfere with the absolute dominion of the coterminous proprietors. If not a principle of natural law, it is at least one which could not long be omitted in the code of a civilized people." See 3 Kent's Com. 423, marginal ; *Holmes* v. *Seely*, 19 Wend. 506 ; *Capers* v. *Wilson*, 3 McCord, 170 ; *Cook* v. *Nearing*, 27 N. Y. 306.

I am fully aware that courts should be slow to justify their decisions on the ground of necessity ; but I am equally conscious of the fact that they will betray their trust if, in the administration of law or in the expounding of constitutional principles, they shut their eyes and refuse to recognize those conditions of society which call into force and operation principles whose existence and recognition cannot be disregarded without bringing ruin on all. As has been well said by another, the law is not a system marked by folly, based on bald sentences, without reason ; it is a grand code, founded on the necessities of men, erected by mature judgment, gradually expanding in beneficence and wisdom as time progresses, and regulating with care the interests of society and civilization. And so believing, I think the instructions given were erroneous, and that the judgment should be reversed and the cause remanded.

WELLS, J.   I concur in the conclusion that the judgment given in the court below must be reversed, but, in so far as this conclusion is based upon a supposed estoppel, I dissent from what my brother BELFORD has said ; and, in so far as

it is sought to rest it upon the statute concerning the irrigation of lands, I dissent from both my associates.

I conceive that, with us, the right of every proprietor to have a way over the lands intervening between his possessions and the neighboring stream for the passage of water for the irrigation of so much of his land as may be actually cultivated, is well sustained by force of the necessity arising from local peculiarities of climate ; as in other countries, out of a like necessity, every proprietor has a way of right to his own close over the premises which shut it from the highway.   But it appears to me that this right must rest altogether upon the necessity rather than upon the grant which the statute assumes to make.   For in other countries, where the necessity does not exist, the right has not been recognized in the courts nor attempted to be confirmed by statute, and, where similar legislation has been attempted, in the instance of private ways, by statute, it has been held to be either void as an appropriation of private property to individual uses (*Taylor* v. *Porter*, 4 Hill, 140 ; *Osborn* v. *Hart*, 24 Wis. 89), or else has been sustained as the regulation of an existing right, and not as conferring one.   *Snyder* v. *Warford*, 11 Mo. 513.

It seems to me, therefore, that the right springs out of the necessity, and existed before the statute was enacted, and would still survive though the statute were repealed.

If we say that the statute confers the right, then the statute may take it away, which cannot be admitted.

Doubtless the exercise of the right may be regulated by statute, but that is not the question here ; and it appears to me unnecessary to determine the validity or effect of the existing legislation.

*Reversed.*