The **STATE** of Texas et al., Appellants,

v.

**HIDALGO COUNTY WATER CONTROL AND IMPROVEMENT DISTRICT NO. EIGHTEEN et al., Appellees.**

**No. 261.**

Court of Civil Appeals of Texas.

Corpus Christi.

March 27, 1969.

First Motions for Rehearing Denied June 5, 1969.

Second Motions for Rehearing Denied July 10, 1969.

## ATTORNEYS OF RECORD

Adams, Graham, Lewis & Graham, Harlingen, Aldrich, McDonald & Stewart, Edinburg, Atlas, Schwarz, Gurwitz & Bland, McAllen, Clayton R. Baird, Edinburg, Frank R. Booth, Executive Director, Texas Water Rights Commission, Austin, Vinson, Elkins, Weems & Searls, Victor W. Bouldin, Houston, R. M. Bounds, McAllen, Norton A. Colvin, San Benito, Albert E. Coneway, Harlingen, Carl Conley, Raymondville, Cox & Patterson, McAllen, Paul Y. Cunningham, Paul Y. Cunningham, Jr., Brownsville, G. F. Dohrn, Mission, Charles T. Downs, Pharr, Ewers, Toothaker, Ewers, Abbott & Evins, R. Glenn Jarvis, McAllen, Barnes & Elick, Charles Elick, McAllen, Ferrero, Snedeker & Vela, Harlingen, Rafael H. Flores, John R. Freeland, McAllen, Osce Fristoe, Harlingen, Garcia & Warburton, Gibbon & Harper, Harlingen, Milo J. Glarner, Raymondville, Greenwood & Russell, Harlingen, Arnulfo Guerra, Roma, H. P. Guerra III, Emilio Gutierrez, Rio Grande City, J. C. Hall, Edinburg, Hall, Mills & Hall, Harry Hall, Mission, Sid L. Hardin, Edinburg, Hemphill & Storter, Brownsville, Henrichson &

Bates, E. G. Henrichson, Edinburg, Carl M. Higdon, Jr., Elsa, Hooper & Robinson, Elbert Hooper, Jr., Austin, Truett Hubbard, Donna, Harley E. Jackson, McAllen, Kelley, Looney, McLean & Littleton, J. C. Looney, Ralph Alexander, Edinburg, Hill & King, Neal King, Mission, Arthur A. Klein, Harlingen, Lauderdale, Bowe & Lauderdale, John W. Bowe, Mercedes, William L. Lemen, San Juan, Raul L. Longoria, Edinburg, Crawford Martin, Atty. Gen., of Texas, Roger Tyler and Vince Taylor, Asst. Attys. Gen., of Texas, Austin, Matthews, Nowlin, Macfarlane & Barrett, W. L. Matthews, San Antonio, W. R. Montgomery, Edinburg, Fred J. Newland, Harlingen, Nielsen & McCormick, S. P. Nielsen, Raymondville, Frank R. Nye, Jr., Rio Grande City, Norman L. Orme, Raymondville, Willis G. Perkin, Pharr, Pope & Pope, John A. Pope, Jr., Rio Grande City, Rankin, Kern, Martinez & Van Wie, H. H. Rankin, Jr., Stonewall Van Wie III, McAllen, Ransome & Ray, Rufus G. Ransome, Rentfro & Rentfro, Brownsville, Robinson, Strawn & Robinson, Raymondville, R. P. Sanchez, McAllen, Baker, Botts, Shepherd & Coates, John S. Sellingsloh, Frank W. R. Hubert, Jr., Houston, Melbert Schwarz, Jr., Houston, Smith, McIlheran & Jenkines, Garland Smith, Weslaco, Carter, Stiernberg, Skaggs & Koppel, Harlingen, Mathews, Nowlin, Macfarlane & Barrett, P. H. Swearingen, Jr., San Antonio, Clara B. Thompson, Port Lavaca, A. J. Vale, Rio Grande City, Ralph A. Vidaurri, Edinburg, J. D. Vollmer, Mercedes, Jackson, Walker, Winstead, Cantwell & Miller, A. W. Walker, Jr., Dallas, Jack Wiech, Brownsville, McGinnis, Lochridge, Kilgore, Byfield, Hunter & Wilson, James W. Wilson, George Byfield, Austin, Hector Yznaga, D. J. Lerma, Brownsville, Linda Schulze, Houston, Zalkin & Cohen, New York City, Ray G. Replogle, Bedford, Pa., Nelson & Campbell, Altoona, Pa., Robert I. Manuel, North Adams, Mass.

JAMES R. NORVELL, Special Justice.

This is an appeal from the final judgment rendered in Cause B–20,576 on the docket of the District Court of Hidalgo County, 93rd Judicial District, styled, The State of Texas, et al v. Hidalgo County Water Control and Improvement District No. Eighteen, et al, and commonly referred to as the Lower Rio Grande Valley Water Suit. In Hidalgo & Cameron Counties Water Control & Improvement District No. Nine v. J. H. Starley, Special Judge, 373 S.W.2d 731 (Tex.Sup.1964), the Supreme Court pointed out that this suit [No. B–20,576] "was filed by the State in 1956 to obtain an adjudication of the water rights to the American share of the waters of the Rio Grande. The fifth amended original petition of the State names approximately three thousand defendants who claim the right to use water from the Rio Grande for a variety of uses, including the irrigation of over 850,000 acres of land situated in the Counties of Starr, Hidalgo, Cameron and Willacy." The judgment from which this appeal is prosecuted adjudicates the water rights on that segment of the river system lying immediately below the Falcon dam and extending to the mouth of the Rio Grande.

I.

*Introductory*

Because of a severe drought and water shortage in the 1950's, suits were filed which invoked the judicial power to control the American waters in the lower Rio Grande. Some of these cases reached the appellate courts in 1952. See, Hidalgo County Water Improvement District No. Two v. Cameron County Water Control & Improvement District No. Five, 253 S.W.2d 294 (Tex.Civ.App.1952, wr. ref'd, n. r. e.), and Hidalgo County Water Improvement District No. Two v. Cameron County Water Control & Improvement District No. Five, 250 S.W.2d 941 (Tex. Civ.App.1952, application for prohibition and injunction denied). Because of this situation and the completion of the Falcon dam, the State of Texas filed the present suit calling for an adjudication of the water rights of those owning or claiming

water rights to lands lying below Falcon Lake or Reservoir. These lands lie within the delta area of the Rio Grande. The contest between the appropriators and those asserting riparian claims to the waters of the river was severed from the cause and docketed under the style of State of Texas v. Valmont Plantations. This severed cause reached the Supreme Court in 1962 and that court held that the Spanish and Mexican grants along the lower Rio Grande did not carry with them appurtenant irrigation rights. The opinion of Mr. Justice Pope of the San Antonio Court of Civil Appeals was adopted as the opinion of the Supreme Court. See, Valmont Plantations v. State of Texas, 163 Tex. 381, 355 S.W.2d 502; 346 S.W.2d 853. After an exhaustive review of the applicable authorities, the Supreme Court disapproved of certain obiter dicta contained in the opinion rendered in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458 (1926), which contained a discussion of Spanish and Mexican water law, although no Spanish or Mexican grant was involved in the case. The circumstance that numerous tracts of land in the lower Rio Grande Valley, having no connection with the legal title to an appropriative right, have been under irrigation for a long period of time does not authorize us to disregard the Valmont decision and say that such lands have a legal appurtenant water right under the appropriation statutes of this State. Further, we are not concerned with the respective merits of the riparian and appropriation systems. The debate with reference thereto has been settled by the Valmont decision insofar as the lower Rio Grande Valley is concerned.

In addition to *Valmont*, the following cases connected with the present controversy have reached the appellate courts: Hidalgo County Water Improvement District No. Two v. Blalock, District Judge, 157 Tex. 206, 301 S.W.2d 593 (1957); Hidalgo County Water Control & Improvement District No. One v. Boysen, 354 S.W. 2d 420 (Tex.Civ.App.1962, wr. ref'd); Hidalgo & Cameron Counties Water Control & Improvement District No. Nine v. Starley, Special District Judge, 373 S.W.2d 731 (Tex.Sup.1964); and State of Texas v. Starley, Special District Judge, 413 S.W. 2d 451 (Tex.Civ.App.1967, no writ, application for mandamus).

The final judgment from which this appeal is prosecuted was rendered on August 1, 1966 to become effective on September 1, 1966. The State of Texas brought the case here and numerous parties, both plaintiff and defendant below, appear herein, and some of them present contentions both as appellants and as appellees. When necessary, the litigants will be referred to by name. As the briefs herein contain well over a hundred points and counterpoints, we shall not unduly lengthen this opinion by noticing particular points except in those instances where it is essential to an understanding of our holdings.

The trial court in its judgment set aside a reserve of 60,000 acre feet of the American waters in the Falcon reservoir for municipal purposes and, in addition, made certain allocations of water in behalf of the towns and cities within the area. After an appeal had been duly perfected to this court, all the parties who had filed points attacking the muncipal allotment of the trial court entered into a stipulation with the cities affected under which it was agreed, subject to the approval of this court, that the trial court's judgment as to the municipal allotment should be modified and judgment rendered for a somewhat smaller amount of water than that fixed by the court below. The stipulation also provided for a distribution of the water allotment between the interested muncipalities. This court approves of the stipulation so agreed upon and judgment will be modified in this particular as therein provided.

## II.

### *The Trial Court's Judgment and the Priorities Established Therein*

The judgment below was rendered by Honorable J. H. Starley, Special District

Judge. It consists of a Foreword and four additional parts which are referred to as sections. According to the Foreword, "Section I is the formal *Decree* itself. which by reference incorporates Section II, the *Decision,* Section III, the individual rights found and adjudicated, and Section IV, the map section for the purpose of identification of the respective tracts."[1]

In addition to the 60,000 acre foot reserve above mentioned, the trial court made various allowances or allotments for Municipal, Industrial and Domestic Uses, including the watering of livestock. As modified by the stipulation heretofore mentioned, these allowances and allotments are approved and judgment as to them is rendered accordingly.

As to the water rights for irrigation purposes, the trial court did not proceed in strict accordance with the principle of "first in time, first in right" usually associated with the appropriative system, but employed a scheme designated as the "weighted or Dalrymple"[2] plan of priorities.

Five classes of priorities of irrigation waters were established and are described in the "Decree" (Section II of the judgment) as follows:

"*Class I or First Priority Classification* are all those lands that have been developed for agricultural purposes by the application of irrigation water under the concept of certified filings which the Court has found and declared to have been established under the Acts of 1895 and 1913. * * *"

"*Class II or Second Priority Classification* shall consists of those areas wherein permits were obtained from the State Board of Water Engineers between the effective date of the Irrigation Act of 1913

and the Treaty date of November 8, 1945, and those areas which were developed thereunder in accordance with the permits. Provided, however, that if the permit was basically a 'drainage water permit' but also had tied into its concept that it included any waters originating from the Rio Grande, the Court has held and now holds that such permits are in fact effective as against the American share of the waters under the Treaty. * * *"

"*Class III or Third Priority Classification* is the classification denominated 'Treaty.' This means that as to the areas designated in Section III hereof and found to have been applying water to beneficial use for agricultural purposes as to each tract of land, such uses are protected under and by virtue of the Treaty. * * *"

"*Class IV or Fourth Priority Classification* is given to those permits granted by the State subsequent to the treaty date of November 8, 1945. * * *"

"*Class V or Fifth Priority Classification* is that group of water rights the Court denominates as 'Falcon.' This applies to lands that had developed some use of water subsequent to the date of the treaty and prior to the actual beginning of Falcon Reservoir in December of 1950 and which areas fall outside of and not within any of the first four categories. * * *"

These priorities were "weighted" by the use of the following language:

"The unallocated water periodically will be divided into equal parts per acre for each Priority class, after a deduction of the 60,000 acre feet per annum reserved for domestic and urban uses. Priority I will be given 1.7 times as much per acre as Priority V, Priority II 1.5

---

1. While the terms "Decree" and "Decision" might in ordinary usage be understood as embracing the entire judgment, we shall not use them in that sense in this opinion, but for clarity will follow the trial court's system of designation and use the terms to refer to those portions

of the judgment so designated by the trial court.

2. Mr. Tate Dalrymple is a hydrologist appointed by the trial court as a Master in Chancery or Water Master in this cause.

times as much, Priority III 1.3 times as much, and Priority IV 1.1 times as much as Priority V."

By the judgment, the approximate percentages of the lands in the suit were allocated to the five classes of weighted priorities as follows: Class I—70%, Class II—19%, Class III—4%, Class IV—2%, and Class V—5%.

A number of objections are leveled against these weighted priorities. The State directly asserts that the trial court erred in placing in the Class I priority numerous tracts of land which have no connection with the legal title to an appropriative right and that there is no valid basis for the minor classifications designated as Class III (Treaty) and Class V (Falcon) priorities. Other parties assert that the trial court erred in deviating from the "first in time, first in right" principle without a supporting cause or adequate reason therefor. Some of the litigants assert that as a result of the 1945 treaty and the construction of storage dams in the river, there should be no distinction on a priority basis attempted between and among owners of water rights in and to the waters of the river. It is also asserted that for the past forty years at least, there has been confusion as to the nature and extent of water rights along the lower Rio Grande [3] and because of this condition, as well as other circumstances, there should be a judicial recognition of rights which are admittedly defective in that the appropriation statutes were not substantially complied with. In view of these various contentions, it is necessary to briefly set out the development of irrigation in the lower Rio Grande Valley.

III.

*Summary of the History of the Rio Grande and the Development of Irrigation on the Lower Reaches Thereof*

The Rio Grande is one of the historic rivers of North America.[4] It is also one of the longest. It rises in the high Rockies of southern Colorado and flows from Colorado through New Mexico, reaches Texas near El Paso and thence flows in a general southeasterly direction to the Gulf of Mexico near Brownsville. By act of the Con-

3. Our attention is called to the following statement of James V. Allred, United States District Judge for the Southern District of Texas, in a memorandum opinion delivered in Martinez v. Maverick County Water Control and Improvement District No. One:
 "For years it has been a matter of common knowledge that the Texas water laws and decisions are in hopeless confusion; that even if they are as clear as some attorneys profess to believe them, their application and administration would be difficult for an agency clothed with ample authority; that the present state laws, which have been on the books without change for decades, confer little, if any, real authority upon the State Board of Engineers; that the Board has granted permits on many streams in the state, very few of which have been cancelled, in such numbers and for such quantities, that if riparian rights are given the full effect for which plaintiffs contend, practically every drop of water, normal flow or flood, is 'bespoken'; that this is particularly true in the Rio Grande Valley; that many studies have been made by interim committees of the Texas Legislature, water conservation organizations, etc.; that bills repeatedly have been introduced for a state water code and wound up to await another study; that another such study is now being readied. * * *"
 This statement is set out in 9 Sw.L. Journal 2, in White and Wilson's Article styled, "The Flow and Underflow of Motl v. Boyd."

4. Paul Horgan, "The Great River." Horgan lists seventeen different names for the Rio Grande and the several reaches thereof which he encountered in his study of the river including Rio Bravo and Rio de las Palmas, the latter referring to the lower portion of the river. Horgan, Vol. 2, p. 981. In the Rio Grande, Colorado, Tijuana treaty of 1945, both "Rio Grande" and "Rio Bravo" are used.

gress of the Republic of Texas of December 19, 1836, the river was established as the boundary between Texas and Mexico.[5] By extending this boundary southward from the Nueces, the Texas Republic not only occupied that portion of the Mexican state of Coahuila and Texas, commonly referred to as Texas, but a portion of the Mexican state of Tamaulipas as well. The Valmont opinion (Valmont Plantations v. State of Texas, 163 Tex. 381, 355 S.W.2d 502 (1962); 346 S.W.2d 853 (Tex.Civ.App. 1961), contains an account of the settlement of the lower Rio Grande Valley by Spanish authority under the direction of Jose de Escondon, the Count of Sierra Gorda. See also, Davenport, "Texas Laws of Waters," Vol. 21, pp. xiii et seq., Vernon's Ann.Tex. Stats.; Casteneda, "Escondon and the Settlement of the Lower Rio Grande," contained in Vol. 3, ch. 4, pp. 130-196 of "Our Catholic Heritage in Texas"; Hill, "Jose de Escondon"; Norvell, "Spanish Towns," 37 Notre Dame Lawyer 630.

In the upper reaches of the Rio Grande, —from the source to El Paso—the water carried by the river is drained from American territory. In 1906, a treaty was ratified between the United States and Mexico relating to the waters of the Rio Grande above Fort Quitman, Hudspeth County, Texas, 34 Stat. 2953. These waters are accumulated primarily from American sources. Under the terms of this treaty, the United States agreed that after the completion of a proposed dam (Elephant Butte) and the distributing system auxiliary thereto, it would deliver to Mexico 60,000 acre feet of water annually at the Acequia Madre, known as the Old Mexican Canal situated above the City of Juarez. It would seem that Mexico had little claim upon these waters which were drained from American lands other than the fact that it had for a number of years been using such waters by diversion into the Acequia

Madre. However, Mexico did waive any and all claims for any purpose whatever to waters between the head of the Mexican Canal and Fort Quitman (some eighty river miles),—an area of scant rainfall and river flow.

The Rio Grande extends 1,120 miles from Fort Quitman to the Gulf and although numerous attempts were made to promulgate a treaty dividing the waters between the two nations, such attempts were not successful until 1944. Before that time, however, extensive agricultural development had taken place in the Rio Grande delta on both sides of the river but particularly on the left bank or American side. This development was almost entirely dependent upon irrigation from waters of the Rio Grande. The river as it flowed southward from Fort Quitman assumed different characteristics from those exhibited in Colorado and New Mexico. The region bordering the river and the territory supplying its waters, such as they were, were largely arid in nature and possessed desert characteristics. The larger portion of the water reaching the delta comes from Mexican sources such as the San Juan, Alamo, Conchos, San Diego, San Rodrigo, Escondido, the Salado and Las Vacas Arroyo. These tributaries carry far more water into the Rio Grande than do the American streams, —the Pecos, Devil's River, Goodenough Spring, Alamito, Terlinguia, San Felipe and the Pinto creeks.

The treaty between the United States and Mexico, ratified in 1945, 59 Stat. 1219, related to the waters of three international streams, namely, the Rio Grande , the Colorado and the Tijuana. Possibly due to this circumstance or the greater agricultural development on the American side, the treaty provided for a 58% (American) and 42% (Mexican) division of the Rio Grande waters.[6] This, despite the fact that it could

---

5. State v. Sais, 47 Tex. 307, 309 (1877).

6. Article 4 of the treaty relating to the allotment of the Rio Grande waters between the two countries is as follows:

"The waters of the Rio Grande (Rio Bravo) between Fort Quitman, Texas and the Gulf of Mexico are hereby allotted to the two countries in the following manner:

be logically argued that each nation should be entitled only to that portion of an international stream as had been drained from its territory. Three proposed storage dams were mentioned in the treaty, one to be located in the section between Santa Helena Canyon and the mouth of the Pecos River, one between Eagle Pass and Laredo, Texas (Piedras Negras and Nuevo Laredo in Mexico), and a third in the section between Laredo and Roma, Texas (Nuevo Laredo and San Pedro de Roma in Mexico). Provision was made for the omission of one or more of the stipulated dams by agreement of the parties and the construction of such additional dams as might be determined by the International Boundary and Water Commission with the approval of the contracting governments. The Falcon dam and reservoir, now constructed, is situated in the section between Laredo and Roma, Texas. Since the filing of this suit,

"A. To Mexico:

"(a) All of the waters reaching the main channel of the Rio Grande (Rio Bravo) from the San Juan and Alamo Rivers, including the return flow from the lands irrigated from the latter two rivers.

"(b) One-half of the flow in the main channel of the Rio Grande (Rio Bravo) below the lowest major international storage dam, so far as said flow is not specifically allotted under this Treaty to either of the two countries.

"(c) Two-thirds of the flow reaching the main channel of the Rio Grande (Rio Bravo) from the Conchos, San Diego, San Rodrigo, Escondido and Salado Rivers and the Las Vacas Arroyo, subject to the provisions of subparagraph (c) of paragraph B of this Article.

"(d) One-half of all other flows not otherwise allotted by this Article occurring in the main channel of the Rio Grande (Rio Bravo), including the contributions from all the unmeasured tributaries, which are those not named in this Article, between Fort Quitman and the lowest major international storage dam.

"B. To the United States:

"(a) All of the waters reaching the main channel of the Rio Grande (Rio Bravo) from the Pecos and Devils Rivers, Goodenough Spring, and Alamito, Terlingua, San Felipe and Pinto Creeks.

"(b) One-half of the flow in the main channel of the Rio Grande (Rio Bravo) below the lowest major international storage dam, so far as said flow is not specifically allotted under this Treaty to either of the two countries.

"(c) One-third of the flow reaching the main channel of the Rio Grande (Rio Bravo) from the Conchos, San Diego, San Rodrigo, Escondido and Salado Rivers and the Las Vacas Arroyo, provided that this third shall not be less, as an average amount in cycles of five consecutive years, than 350,000 acre-feet (431,721,000 cubic meters) annually. The United States shall not acquire any right by the use of the waters of the tributaries named in this subparagraph, in excess of the said 350,000 acre-feet (431,721,000 cubic meters) annually, except the right to use one-third of the flow reaching the Rio Grande (Rio Bravo) from said tributaries, although such one-third may be in excess of that amount.

"(d) One-half of all other flows not otherwise allotted by this Article occurring in the main channel of the Rio Grande (Rio Bravo) including the contributions from all the unmeasured tributaries, which are those not named in this Article, between Fort Quitman and the lowest major international storage dam.

"In the event of extraordinary drought or serious accident to the hydraulic systems on the measured Mexican tributaries, making it difficult for Mexico to make available the run-off of 350,000 acre-feet (431,721,000 cubic meters) annually, allotted in subparagraph (c) of paragraph B of this Article to the United States as the minimum contribution from the aforesaid Mexican tributaries, any deficiencies existing at the end of the aforesaid five-year cycle shall be made up in the following five-year cycle with water from the said measured tributaries.

"Whenever the conservation capacities assigned to the United States in at least two of the major international reservoirs, including the highest major reservoir, are filled with waters belonging to the United States, a cycle of five years shall be considered as terminated and all debits fully paid, whereupon a new five-year cycle shall commence."

a second dam known as Amistad has been completed. It is situated below the confluence of the Devil's River and the Rio Grande.

The size and storage space of the reservoirs created by these dams are indicated by the following:

### Falcon Reservoir

Location—80 miles down stream from Laredo, Texas
Maximum design flood stage—4,150,000 acre feet
Conservation storage space (winter)—2,771,000 acre feet
Conservation storage space (summer)—2,710,000 acre feet
Flood storage space (winter)—509,480 acre feet
Flood storage space (summer)—909,480 acre feet
Division of conservation storage—United States—58.6%, Mexico—41.4%
United States conservation storage (winter)—1,620,000 acre feet

### Amistad Reservoir

Location—12 miles up stream from Del Rio, Texas
Maximum design flood stage—5,660,000 acre feet
Conservation storage space—3,550,000 acre feet
Flood storage space—1,775,000 acre feet
Division of conservation storage—United States—56.2%, Mexico, —43.8%
United States conservation storage—1,995,000 acre feet

The 1945 treaty also changed the name of the International Boundary Commission, established in 1889, to the "International Boundary and Water Commission, United States and Mexico," and vested it with extensive authority over the Rio Grande waters including the measuring, storing and release of reservoir waters for flood prevention purposes or to satisfy the water needs of the contracting nations.

The construction of dams along the Rio Grande and the impounding of waters that otherwise would have flowed to the sea, particularly during flood periods, undoubtedly increased materially the amount of water that was available for irrigation of lands on the American side of the river. The State of Texas had no control over nor official part in the construction of the Rio Grande storage dams nor does it regulate or control the release of waters from the treaty reservoirs. No requirement was made that those holding irrigation water rights in and to Rio Grande waters surrender such rights to the authority controlling the storage dams. The 1945 treaty contemplated that the dams to be constructed should be operated by the International Boundary and Water Commission so as to insure the continuance of existing uses and development of the greatest number of feasible projects within the limits of the treaty provisions.

As a result of the promulgation of the treaty and the construction of the dams in accordance therewith, the State of Texas received considerably more water for irrigation purposes than it had been using from the free flowing river and also received a larger percentage of the Rio Grande waters than it would have received had such waters been divided upon a fifty-fifty basis or under a plan which would allocate to each country those waters which flowed over or were drained from its territory into the river.

The non-static and ever changing nature of the Rio Grande was emphasized by

Judge Starley in the "Decision" portion of his judgment and this factor is worthy of note. In the nineteenth century, the river was navigable in fact and the treaty of Guadalupe-Hidalgo, which formally ended the Mexican War, provided that neither of the contracting nations would interfere with the free navigation of the river. At present, the water course is an unstable and irregular river in its lower reaches, visited alternately by drought and flood.[7] Increased irrigation along the Mexican tributaries of the Rio Grande constituted another complicating and changing factor. International action became essential to forestall disastrous economic losses. However, action was taken; dams were constructed for flood control, hydraulic power and storage purposes, and the Rio Grande thereupon ceased to be a free flowing stream.

### IV.

*Statutory Enactments Pertinent to the Appropriation of Waters from the Rio Grande*

The Texas water appropriation acts were primarily intended to apply to free flowing streams and contemplated that such dams and storage facilities as were desirable would be constructed by the water appropriators. There were no Texas statutory enactments governing rights to waters impounded by state, governmental or international action.

The appropriative system was imported into Texas by the 1889 Irrigation Act, Acts 1889, 21st Leg., p. 100, ch. 88, Gammel's Laws of Texas 1128, which provided that an appropriator could acquire a water right and fix a priority by diverting water from

a stream, putting it to a beneficial use and filing with the County Clerk an affidavit and map depicting the diversion works and describing the proposed use. This Act, as well as the 1895 Act which followed it, applied only to the arid regions of the state.

In 1895, the Legislature rewrote the appropriation law, Acts 1895, 24th Leg., p. 21, ch. 21, 10 Gammel's Laws 751, and divided the public waters of the state into "ordinary flow and underflow" on the one hand and storm or rain waters on the other. It also carried forward the 1889 provisions which required the filing of a map and affidavit by the appropriator, but provided that a failure to so file should not work a forfeiture of theretofore acquired rights. The Act also specified the items to be included in the sworn statement filed for record with the County Clerk and required that the affidavit show the approximate number of acres to be irrigated, the name of the ditch or canal, and its size, capacity and location, the name of the appropriator, and the name of the stream from which water was to be taken. A map showing the route of the ditch or canal was to be attached to the affidavit. Upon filing, the appropriator was required to proceed with diligence in the construction of his proposed works. Completion of such works constituted the perfection of the water right. A project was completed and a water right perfected by taking the water into the system and conveying it through the canal as shown on the map to the place of intended use described in the sworn statement.

In 1913, the Legislature adopted the Burges-Glasscock Act. Acts 1913, 33rd Leg., p. 358, ch. 171, 16 Gammel's Laws of Texas 358, which had statewide application. All waters in Texas streams to which

---

7. For example, it appears that in 1905, the highest maximum recorded flow occurred. This amounted to 12,260 cubic feet per second or 8,870,000 acre feet. The minimum annual recorded flow occurred in 1953 and amounted to only 1,278 cubic feet per second (925,200 acre feet), as compared with the average annual flow of 5,465 cfs, or 3,956,000 acre feet. These measurements were made at the Roma gauge and are based upon the years 1900–1913 and 1923–1954. The gauge was inoperative for some ten years 1913–1923.

It also appears that on June 30, 1954, the maximum discharge at Laredo was 716,900 cfs, while in the year before, 1953, there were several days during June and July that the river ceased to flow.

prior rights had not attached were declared to be the property of the State and a Board of Water Engineers, a predecessor agency to the present Texas Water Rights Commission, was created. The 1913 Act also gave rise to the term, "Certified Filing" (C.F.), in that it required the County Clerk of the respective counties to prepare certified copies of all instruments in his office relating to the appropriation of public waters and forward them to the office of the Board of Water Engineers, where they were filed and serially numbered.

The 1913 Act also introduced a permit system which was placed under the control of the Board of Water Engineers. The County Clerk filing procedure was superseded and an application to the Board of Water Engineers for a permit to appropriate water was substituted therefor.[8]

The Burges-Glasscock Act was revised and expended by the Canales Act of 1917, Acts 1917, 35th Leg., p. 211, ch. 88, however, the permit system was retained and it is not essential here to discuss the 1917 legislation in detail except to say that an administrative system for the adjudication of water rights provided for in the Act was

nullified by the Supreme Court in Board of Water Engineers v. McKnight, 111 Tex. 82, 229 S.W. 301 (1921).[9]

By virtue of these appropriation statutes, the adoption of the common law as the rule of decision in Texas,[10] and various court decisions, Texas has with certain exceptions recognized two systems of rights relating to water flowing in the streams and rivers of the state, namely, the riparian by common law [11] and the appropriative by statute. Wells A. Hutchins, "The Texas Law of Water Rights," pp. 101 et seq.

The present suit was filed on June 28, 1956 and as of October 17, 1956, the court took judicial custody of the American waters of the Rio Grande in that reach of the river extending from Falcon reservoir to the Gulf of Mexico.[12] A temporary injunction was issued restraining the diversion of water from the river in violation of the court's custodial control. Since that date, the American waters have been divided and allotted among the various users by a Master in Chancery or Water Master under the direction of the district court.[13]

---

8. The Texas Water Rights Adjudication Act, Acts 1967, 60th Leg., p. 583, ch. 296, Article 7542a, Vernon's Ann.Tex.Stats., contains, among others, the following definitions of a "certified filing" and a "permit":

 " 'Certified filing' means a record of appropriation filed with the Board of Water Engineers under the provisions of Section 14 of Chapter 171, Acts of the 33rd Legislature of Texas, 1913, and amendments thereof."

 " 'Permit' means a permit to appropriate public water issued by the Texas Water Rights Commission or its predecessors or successors in interest."

9. In connection with the McKnight case, see, Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961 (1945).

10. "Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled, That the Common Law of England (so far as it is not inconsistent with the Constitution or the Acts of Congress now in force), shall, together with such Acts be the Rule of Decision in this Repub-

lic, and shall continue in full force until altered or repealed by Congress." Acts of the 4th Congress (1840), Republic of Texas, Vol. 1, p. 3, Gammel's Laws of Texas, Vol. 2, p. 178. See also, Art. 1, Vernon's Ann.Tex.Stats.

11. Wiel, in 6 Cal.L.Rev. 245 (1918), propounds the thesis that essentially the riparian system is of civil law origin and became a part of the English law through the influence of the Americans, Kent and Story.

12. In an earlier case, the district court temporarily assumed custody of the American waters of the Rio Grande. See, Hidalgo County Water Improvements District No. Two v. Cameron County Water Control and Improvement District No. Five, 253 S.W.2d 294 (Tex.Civ.App.1952, wr. ref'd, n.r.e.).

13. As to legislative action taken in regard to control of waters pending litigation, see, Acts 1957, 55th Leg., p. 1347, ch. 458, as amended, Acts 1965, 59th Leg., p. 51, ch. 18, Art. 7589b, Vernon's Ann. Tex.Stats.

As above noticed, that portion of the case relating to the conflicting claims of the appropriators and riparians to the waters of the Rio Grande was severed from this cause and was decided by the Supreme Court adversely to the riparian claimants of lands who held under Spanish and Mexican land grants. Valmont Plantations v. State of Texas, 163 Tex. 381, 355 S.W.2d 502 (1962); 346 S.W.2d 853 (Tex.Civ.App.1961).

## V.

### The Weighted Priorities

 While, in view of the unprecedented circumstances of this case, it is our opinion that a plan of weighted priorities is both permissible and desirable, we are unable to agree with the classification of priorities set forth in the judgment. Undoubtedly, in recent years a different approach to the matter of water use has developed not only in Texas but throughout the United States. It has been suggested that when there is an abundant quantity of available water and few people, the riparian system works satisfactorily; when there is less water and more people, an appropriation system of sorts usually develops and for a while meets the exigencies of the situation, but when there is still less water and still more people, a demand for governmental conservation, control and allotment becomes imperative. If there is one persisting factor operating to influence and shape the law of waters, it is, as pointed out by Judge Starley, the element of change,—change in conditions as to populations and physical characteristics of water courses. Cf. Trelease, "Trends in the Law of Prior Appropria-

tion," Water Law Conference, University of Texas, 1952–1954, p. 206. In 1942, Wells A. Hutchins[14] noted that in 1911, Wiel suggested that there might be a modification of a strict priority system.[15] Mention was also made of Harold Conkling's views that the doctrine of appropriation as interpreted by the courts has not been entirely satisfactory for complex conditions and that there has been a tendency toward modification. Conkling gives as examples the Inter-State Compacts, the Central Valley Project in California and the tendency toward "equitable allocation" of waters in cases between states before the Supreme Court of the United States.[16] Wiel is also quoted as saying:

> "At all events, adjusting uses that are now on hand seems to be getting more attention than additional development. In terms of law, the moderating principles of correlative rights and reasonable use seem to be outstripping exclusive rights by priority of appropriation in general esteem. This is the impression which, it is believed, an observer gets from fifty years of water law here reviewed."[17]

There is this additional complication in this case. Some parties to this suit hold under certified filings which call for the normal flow and underflow of the river. Others claim under certified filings or permits which call for flood waters. See, Motl v. Boyd, 116 Tex. 82, 286 S.W. 458 (1926). Still others call for both classes of water. The trial court here found "as a fact that for all practical purposes it is impossible to classify waters in the categories" of normal flow and flood waters. The court further found that "neither the

14. Hutchins, "Selected Problems in the Law on Water Rights in the West," Department of Agriculture, Miscellaneous Publication No. 418.

15. S. C. Wiel, 1 Water Rights in the Western States, 3rd Ed. 329.

16. Harold Conkling, "Administrative Control of Underground Waters; Physical and Legal Aspects," Proceedings, American Society of Civil Engineers, Vol. 62, No. 4, pp. 485–516 (1936).

17. S. C. Wiel, "Fifty Years of Water Law," 50 Harvard Law Review 252 (1936).

hydrologists nor the legal profession can identify 'normal' flow as defined in Motl v. Boyd." Honorable Roger Blalock, who tried the Valmont phase of the case, had similar difficulties.[18] In many respects, the Rio Grande has the characteristics of a waterway described in Spanish law as a "torrent,"—a course having an unstable and unpredictable source of ground water with the result that at times, it resembles a dry creek, while in times of heavy rainfall, it serves as a floodway.[19]

## VI.

### *The Treaty and Falcon Classifications*

■ The Third (Treaty) and Fifth (Falcon) classifications or weighted prior-

ities are attacked by the State as well as other parties to the suit. Seemingly, in defense of the trial court's action, it is asserted by some of the parties that the legislative acts, under which the various applications for appropriations were made, refer to the rivers, streams, etc. *within* the State of Texas (or within those arid portions of the state), and hence have no application to the Rio Grande which is an international stream constituing the boundary between two sovereign nations and does not lie *within* the State of Texas. While this a possible construction of the appropriation acts, it is not the only construction that may be placed upon such statutes. It has never been adopted or approved by any court decision, but on the other hand, the State has through its ad-

18. In a written statement or opinion, Judge Blalock discussed the difficulties of applying the Motl-Boyd definition or concept of "normal flow" to the Rio Grande, particularly in view of the construction of the Falcon dam and reservoir. He said:

"Also great difficulty has been experienced in this case in trying to apply the formula of 'highest line of ordinary flow,' for the reason that such term appears to be wholly foreign to those men in the engineering profession who qualify as expert hydrological engineers, and who, in their profession, have well-established formulas for determining such things as 'mode flow,' 'base flow' and 'median flow,' none of which appears to be the same thing as highest line of ordinary flow.

"Another point of difficulty in applying the definition set forth in Motl v. Boyd, relates to the construction of the phrase, 'uninfluenced by recent rainfall or surface run-off.' Undoubtedly, before the waters of the Rio Grande had been tapped for use by man, so that what the engineers call the 'virgin flow' existed, the river was fed by mountain springs in other states, as well as by melting snows, and there was a constant flow of water through the Rio Grande Valley. But it is apparent from the evidence in this case that most of the water that now flows through the Rio Grande Valley, in the Rio Grande River, originates as surface water from rainfall on the watershed of the river somewhere below El Paso, and since there are few springs and no melting

snows in this area, this water comes from rainfall in the form of surface drainage. Since it is also a matter of common knowledge that the area in the Big Bend National Park, for example, through which this river flows, is rugged terrain, the drainage water flows rapidly into the river, so that the effect of 'recent rainfall' is quickly apparent in the flow of the stream. Now, the term 'recent rainfall' is, of course, a relative thing. Just when does drainage water from a rain storm cease to be recent rainfall on the Rio Grande? It is a matter of common knowledge that Southwest Texas is, generally speaking, an arid country, so that most of the water that flows in the river must come from rain storms which periodically sweep across its watershed. Just when does such water lose its flood water or 'recent rainfall' characteristics? If it enters Falcon Dam three or four days after such storm, still bearing the mud and debris characteristic of flood waters, filling the river from bank to bank where only a trickle ran the day before, can it be considered in determining highest line of ordinary flow? Even the figures at the various gauging stations present perplexing problems, for the reason that the flow at such stations varies so greatly from day to day, and so greatly from station to station." Water Law Conference, University of Texas, 1959, pp. 16–40, l.c. 32–33.

19. Cf. McCurdy v. Morgan, 265 S.W.2d 269 (Tex.Civ.App.1954, wr. ref'd).

ministrative agencies, notably the Board of Water Engineers, repeatedly recognized the applicability of such statutes to the Rio Grande. We recognize this long standing administrative practice and hold that it was the intent of the Legislature that the statutory enactments relating to the appropriation of water should have application to streams which constitute a portion of the boundaries of the state.

It is argued that the 1945 Rio Grande, Colorado and Tijuana treaty operated to vest some kind or species of water right in all those who were in fact using water at the time of the treaty's ratification. Article 5 of the treaty does refer to "existing uses" in these words:

"The two governments agree to construct jointly, through their respective Sections of the Commission, the following works in the main channel of the Rio Grande (Rio Bravo):

"I. The dams required for the conservation, storage and regulation of the greater quantity of the annual flow of the river *in a way to ensure the continuance of existing uses* and the development of the greatest number of feasible projects, within the limits imposed by the water allotments specified * * *"

It is urged that:

"The Treaty does not limit or restrict the existing uses as mentioned in Article 5 to uses existing pursuant to appropriative rights acquired under the laws of the State of Texas, and it is nowhere provided in the Treaty, in the protocol, in the ratification by the United States Senate or in any statute enacted by Congress authorizing and providing for the construction of any of the international dams contemplated by Article 5 that the existing uses were limited or restricted to those based upon appropriative rights granted by the State of Texas or acquired pursuant to its irrigation laws."

The Secretary of State at the time of the consideration of the treaty, Honorable Cordell Hull, in discussing the probable benefits of the treaty, stated:

"The quantity thus allotted will not only supply existing uses but also will permit, by an efficient use of the water, considerable expansion of irrigated areas in Texas." [20]

It also appears that while the treaty was being considered by the United States Senate, the Texas Legislature adopted a House Concurrent Resolution which was presented to the Senate Committee on Foreign Relations in connection with the appearance before that body of Honorable Grover Sellers, Attorney General of Texas. This concurrent resolution contained the following statement:

"Whereas the impounding of these waters and their equitable distribution between the two countries will not only safeguard and protect existing uses but will permit expansion of our 400,000 acres of irrigated lands within the United States, thus materially adding to the food supply of the country and to the prosperity of the State of Texas;"

and that it be

"resolved by the House of Representatives of the State of Texas, the Senate concurring, that the Texas legislature go on record endorsing the ratification of the Treaty and that the Senate of the United States be, and it is hereby urged to ratify the said Treaty at the earliest possible moment." [21]

While we recognize that the promulgation and ratification of the 1945 treaty had a highly important bearing upon the issues involved in this litigation, we do not accept the theory that the United States as one

20. Contained in message of the President to the Senate, February 15, 1944 (Senate Document, Executive A, 78th Congress, Second Session).

21. Hearing before Committee on Foreign Relations, Part IV, pp. 1242–1243.

of the contracting powers conferred upon all those using water from the Rio Grande in 1945 a legal right not theretofore held by such persons. In the Senate Resolution ratifying the treaty, it was expressly stated that:

"(b) Insofar as they affect persons and property in the territorial limits of the United States, the powers and functions of the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, the United States Section of said Commission, and any other office or employee of the United States, shall be subject to the statutory and constitutional controls and processes. * * *

"(c) That nothing contained in the treaty shall be construed as authorizing the Secretary of State of the United States, the Commissioner of the United States Section of the International Boundary and Water Commission, directly or indirectly, to alter or control the distribution of waters to users within the territorial limits of any of the individual States."

In Hidalgo County Water Control & Improvement District No. Seven v. Hedrick, 226 F.2d 1 (1955), the United States Court of Appeals for the Fifth Circuit, in considering the effect of the 1945 treaty, said:

"The treaty apportioned the water of the Rio Grande and allocated the share that might be diverted and used on each side of the river, but without making or intending to make any provision as to how or by whom the water so apportioned and allocated should be used upon being diverted. Increases in diversion to and use upon either side is prohibited except upon the condition stated. We think it was intended by the parties to the treaty that to each nation should be left the power of making determinations, pursuant to its own law, of those who are, may become, or cease to be, en-

titled to the use of the waters secured by the treaty to such nation, and their relative rights among themselves. If any intent had been present to create or protect or give a priority to individual property rights of one group resulting in the diminution of those of another group, the operative language would have been couched in more explicit terms."

The existence of the treaty cannot be ignored as an important factual circumstance in this case, but the United States did not by the treaty confer on anyone a right emanating from the central government to make use of the waters of the Rio Grande. The judgment is modified so as to eliminate the No. III or treaty classification. We shall hereinafter treat of priorities from a different approach and in so doing, again refer to the Class III (Treaty) classification.

Little need be said here with reference to the No. V or Falcon classification. Other than the circumstance that certain parties were actually making use of Rio Grande water upon a certain date, there is little to be said in its behalf. Because of reasons and circumstances hereinafter mentioned, we do not deprecate the element of actual use, but all that we need say here is that the Falcon classification cannot be supported upon the grounds set forth in the trial court's "Decision" portion of the judgment. This section of the judgment may in some respects be equated with findings of fact and conclusions of law. The judgment is modified so as to eliminate the No. V or Falcon classification.

## VII.

*Class I or First Priority Classification*

As above pointed out, the trial court applied this classification to those lands that had been used for agricultural purposes by the application of irrigation water *under the concept of certified filings.* This classification makes a distinction be-

tween lands developed before 1913 when the permit system superseded the certified filings and those that were developed thereafter. It also awards to persons who have no connection with the legal title to the water appropriation, a First Priority Classification. The 1895 Act required that an appropriator in his sworn declaration to take public waters state among other things, the approximate "number of acres of land that will be irrigated." Some of these statements or declarations were both extreme and inedfinite,[22] and many of the descriptions of the lands to be irrigated set forth in such declarations were conflicting and overlapping. However, the trial court awarded numerous persons and tracts a Class I priority simply because their land was situated within the land area proposed to be irrigated as indicated by a certified filing, despite the fact that they had no connection with the filing; the theory being that such development took place under the *concept of certified filings* rather than because of a compliance with statutory requirements. In our opinion, the State's point, as well as that of other parties attacking this theory of "concept of certified filings," is well taken and calls for a modification of the judgment.

## VIII.

### *The Class II and Class IV Priorities*

These classifications are based upon date brackets. Class II embraces those areas for which permits were obtained from the Board of Water Engineers between the effective date of the Irrigation Act of 1913 and November 8, 1945, the date upon which the Rio Grande-Colorado-Tijuana treaty was ratified. Class IV is a minor classification and embraces 12,640.99 acres of land in Hidalgo County for which permits were granted subsequent to the treaty date of November 8, 1945. Distinctions are thus sought to be made between those holding under permits issued before and after the date of the treaty. Both of the permit classifications are made inferior to the rights of those holding under declarations made in accordance with the Act of 1895, which gained the status of certified filings by compliance with the Burges-Glasscock Act (1913). These classifications may roughly accord with the "first in time, first in right" principle of the appropriative system. However, in application, certain difficulties are encountered. The 1895 statute makes a distinction between "the ordinary flow or underflow of every running or flowing river or natural stream and the storm or rain waters of every river or natural stream, * * *." This distinction is recognized in subsequent statutes. See, Motl v. Boyd, 116 Tex. 82, 286 S.W. 458 (1926), in which it was held that riparian rights attach only to the ordinary flow or underflow of a river. There are no riparian rights to irrigation along the reaches of the Rio Grande with which we

22. For example, in 1908, John J. Conway filed a declaration dated November 21, 1907, in which he stated his intention "to appropriate from the waters of the Rio Grande River a sufficient quantity of volume of the same with which to irrigate the said 27,000 acres of land embraced in said three Porciones 55, 56 and 57 and two Porciones Number 53 and 54, and the additional acreage of the adjoining five porciones heretofore enumerated, and the Melado grant, about 86,000 acres total."

On October 30, 1908, Mr. Conway prepared and subsequently filed a supplemental application which described an enlarged canal to be used "for the purpose of conveying said waters to the lands situated and embraced in the territory be-ginning near the west line of Porcion Number 53 and running northwardly to the track of the St. Louis, Brownsville and Mexico Railway; crossing the railroad in a northeastwardly course, and thence following the contour of the country northeastwardly to the Laguna Madre, and embracing in the territory thus described, all the land lying south of said line and between it and the Rio Grande River to its mouth, said lands being situated in the counties of Hidalgo and Cameron, and comprising in addition to the 86,000 acres above described, 245,000 acres north and east of said Porciones Numbers 53, 54, 55, 56 and 57."

An area in excess of 100,000 acres was, however, placed in irrigation under the Conway filings.

are here concerned, Valmont Plantations Company v. State of Texas, 163 Tex. 381, 355 S.W.2d 502 (1962); 346 S.W.2d 853 (Tex.Civ.App. 1961), but as above pointed out, many of the certified filings here involved refer to an intention "to appropriate for irrigation purposes the unappropriated water of the ordinary flow and underflow of the Rio Grande. * * *" Our attention has not been called to any certified filings wherein an intention was expressed to construct storage "dams, dykes or reservoirs" for the purpose of holding or storing the storm or rain waters of the river.[23] Along the Rio Grande as a usual procedure, water is raised or lifted from the river by means of pumps, many of which are of enormous capacity. Other than use of the canals themselves, no provision for storage is attempted. Some applications for permits filed under the 1913 and later Acts do include plans for reservoirs and the permits purport to award the applicants the right to appropriate the "storm or rain waters" of the river, as well as certain rights in and to the ordinary flow and underflow of the Rio Grande.

In the "Decision" portion of his judgment, Judge Starley expressly found that:

"While the records for the past sixty-odd years give some indication of what have been classed flood waters, what might have been 'normal flow' the changes upon the tributaries and the construction of the storage reservoir at Falcon and Amistad now in progress have so comingled and changed the physical characteristics of the River that the court will find as a fact that for all practical purposes it is impossible to classify waters in the Rio Grande as so comingled has become a part of the American share, and it is composed of the chemical elements that make up water."[24]

While it may be impossible to state with accuracy the proportions of the two classes of water that may be impounded in Falcon reservoir at any particular time or within any particular year, it is reasonably safe to assume that the greater portion of said waters is and will be storm or flood waters, and it could be argued with force that those certified filings and permits calling for storm waters should be allowed a preference over those calling only for the ordinary flow and underflow of the river. In our opinion, there is no practical value to be realized in recognizing a distinction between certified filings and permits, nor between permits of different dates. All of such filings and permits were issued under laws which were adopted in contemplation of free flowing as contrasted with controlled rivers or streams.

## IX.

### Legal and Equitable Claims

The Attorney General and many of those parties holding under certified filings and permits assert that the Legislature of this state has provided an exclusive way by which appropriative water rights may be acquired and that unless such statutory procedures are followed, a valid water right cannot be acquired. We recognize the force of this argument and although the Legislature in 1895 and 1913 never en-

23. In State Board of Water Engineers v. Slaughter, 382 S.W.2d 111 (Tex.Civ.App. 1964, writ ref'd n.r.e.), the court held that a dam or storage facility was not essential to an appropriation of storm waters and that, "A canal which was so constructed as to divert the ordinary flow or underflow would necessarily divert some storm waters also." The particular filing covered both classes of water. As a practical matter, no appreciable amount of flood waters can be steadily available without some storage facility.

24. A similar finding was made by Judge Blalock who tried the Valmont branch of this case. As heretofore pointed out, Judge Blalock found it impossible to determine the normal flow of the river under the guide lines set forth in Motl v. Boyd, 116 Tex. 82, 286 S.W. 458 (1926). Even if the hydrologist's "base flow" be accepted as the equivalent of "the highest line of ordinary flow," difficulties still remain. Blalock, 1959 Water Law Conference, University of Texas, p. 16, l.c. 35, et seq.

visioned or contemplated the present existing situation, we would not be justified in saying that the statutes have no application to the case. However, the equity arm of a court is not inoperative in the presence of an unprecedented situation. In fact, in one of the suits precipitated by the drought of the 1950's, a district court, for the first time in Texas, took judicial custody of the waters of a flowing river and appointed a Master in Chancery or River Master in order to control an unprecedented condition then existing along the lower Rio Grande. Hidalgo County Water Improvement District No. Two v. Cameron County Water Control and Improvement District No. Five, 253 S.W.2d 294 (Tex.Civ.App.1952, writ ref'd n.r.e.). The Water Master procedure has been followed in this case and has now been sanctioned by legislative enactment. Acts 1957, 55th Leg., p. 1347, ch. 458, amended, Acts 1965, 59th Leg., p. 51, ch. 18, Article 7589b, Vernon's Ann.Tex.Stats.; State v. Starley, 413 S.W.2d 451, 1.c. 464 (Tex.Civ.App. 1967, orig. mand.).

We have heretofore set out a number of salient facts and circumstances which make up a most unusual situation and we here briefly recapitulate.

1. The uncertainty as to the nature and origin of water rights along the lower section of the river prior to the decision of the Supreme Court in the Valmont case, 163 Tex. 381, 355 S.W.2d 502 (1962); 346 S.W.2d 853 (1961).[25]

2. While no water right as such emanated from the United States to anyone, it is a fact and circumstance of this case that the promulgation of the treaty and the construction of dams across the river has,

(a) changed the river from a free flowing stream to a controlled water course, and

(b) made available for Texas users along the left or American bank of the Rio Grande a much greater amount of water for irrigation purposes by virtue of the approximate 58%–42% division of the waters between the United States and Mexico and the providing of storage space for flood waters.

3. The failure of the Legislature, largely because of the dispute between landowners in the lower Valley as to the nature and extent of their water rights, to specifically treat of rights in stored waters when such storage made greater quantities of water available for irrigation purposes by the construction of dams by agencies of the national or state governments. The statutes of 1895 and 1913 sound as an uncertain trumpet in the complicated situation which now confronts us, involving as it does the mixing and impounding of two classes of water,—flood and ordinary flow. There is room for some equitable adjustment.

4. Insofar as certified filings under the 1895 Act are concerned, the State of Texas provided that one might obtain an appropriative right by complying with the statute and designating an area which the appropriator intended to irrigate. The 1913 Act and subsequent statutory enactments relating to the permit system had similar provisions as to the area proposed to be irrigated. It was the trial court's theory that if lands were within the area described or indicated in a certified filing or an application for a permit, the State had in fact extended a privilege which might be matured into a water right by putting water to a beneficial use upon the land described in the declaration or the application for a permit, and that while the State had an interest in the waters being put to a beneficial use, it had no particular interest in *who*

---

25. In this connection, it may be noted that the commentary on the Texas Law of Water Rights in Vol. 21, Vernon's Ann. Tex.Stats., was written by Honorable Harbert Davenport, a well known and able champion of the riparian system. The pocket parts of the volume contain a special notice of the Valmont decision so that a lawyer may read the opinion in connection with the commentary. Judge Starley in effect found this confusion to exist and such confusion is one of the facts and circumstances of this case.

made such beneficial use of the water so long as it was applied to lands within the area indicated in the declaration or application for permit. Although we think it essential that a connection with the title to the appropriation be shown before a legal right can be established, nevertheless it must be recognized that a privilege of sorts had been extended by the State which included the area covered by a declaration or application for a permit. So far as we have been able to ascertain, the Board of Water Engineers, or any successor state agency, has never taken action to cancel, restrict or limit the scope or operations under a certified filing or permit which had been issued relating to the waters of the Rio Grande. The lands along the lower river seem to be blanketed, so to speak, with certified filings and permits, many of which are conflicting and overlapping. The trial court has found that those tracts which were given a Class I priority lay within an area covered by a certified filing. Such claims, while imperfect, nevertheless have a connection with State legislative action and are cognizable in equity.

5. The general public policy of the State existing before and strengthened by the 1917 conservation amendment to the Texas Constitution (Art. 16, Section 59, Vernon's Ann.St.).

■ The trial court recognized water rights as existing in persons and lands having no connection with the legal title to water rights evidenced by certified filings or permits. In so doing, the court necessarily found that there are actual good faith uses being made of the Rio Grande waters, although some of such users may not be connected with a statutory appropriation. It is also apparent that some few others, which will be hereinafter specifically noticed, are also actual good faith users. We are of the opinion that while such persons may not be entitled to a right of the same grade or class as those who have complied with the appropriation statutes or whose rights have been recognized by the State in some way, they are nevertheless entitled to consideration by a court of equity.

As might be expected, there are no precedents controlling the unusual situation presented. The cases which bear some similarity to the present litigation and illustrate the extensive powers of equity in unusual circumstances are those rendered by the courts of the Western States which recognized custom as a basis for an appropriative right and thus prior to legislative action gave judicial approval to a non-riparian water system. And this, despite the fact that the title to the subject matter of the litigation, i.e. land and water, had never passed out of the sovereign. See, Irwin v. Phillips, 5 Cal. 140, 63 Am.Dec. 113 (1855).[26]

In Coffin v. Left Hand Ditch Co., 6 Colo. 443 (1882), the appropriation system was judicially recognized in Colorado as the riparian system was wholly unsuitable to meet the needs of the state. In the earlier case of Yunker v. Nichols, 1 Colo. 551 (1872), which foreshadowed the decision of Coffin v. Left Hand Ditch Co., Mr. Justice Belford, concurring in an order of reversal and remand, said:

"I am fully aware that courts should be slow to justify their decisions on the ground of necessity, but I am equally conscious of the fact that they will betray their trust if, in the administration of law or in the expounding of constitutional principles, they shut their eyes and refuse to recognize those conditions of society which call into force and operation principles whose existence and recognition cannot be disregarded without bringing ruin on all. As has been said by another, the law is not a system marked by folly, based on bald sentences without reason; it is a grand code, founded

26. See, Frank J. Trelease, Dean and Professor of Law, University of Wyoming, "Trends in the Law of Prior Appropria- tion," Water Law Conferences 1952–54, University of Texas, p. 206.

upon the necessities of man, erected by mature judgment, gradually expanding in beneficence and wisdom as time progresses, and resulting with care the interest of society and civilization." (p. 569)

See also, Irwin v. Phillips, 5 Cal. 140, 63 Am.Dec. 113 (1855); Conger v. Weaver, 6 Cal. 548, 65 Am.Dec. 528 (1856); Merced Mining Co. v. Fremont, 7 Cal. 317, 68 Am. Dec. 262 (1857); Merritt & Bourne v. Judd & Byrne, 14 Cal. 59 (1859);[27] Snow v. Abalos, 18 N.M. 681, 140 P. 1044 (1914); Water and Water Rights, Robert Emmet Clark, Editor, Sec. 19.5 (1956); Wiel, Water Rights in the Western States (3rd Ed.) 80.

As above pointed out, there is in this state a strong public policy against waste. It hardly seems appropriate to say that in times of abundant water, we must nevertheless adopt a strict literal construction of statutes that were not designed for and hence in part are not suited to the regulation of rights in and to waters stored by governmental action when such course would deprive good faith users of water and allow the same to flow unused to the Gulf. These good faith users are before the court for the purpose of having their rights adjudicated. If it rests within the power and authority of the court to adjudicate such claims, relief should not be denied. In our opinion, equitable rights may be recognized because of the considerations above mentioned. We think classifications based roughly upon legal and equitable bases can be made effectively operative and that a 1.7 to 1 weighted priority plan will be substantially in accord

with the trial court's theory of the division of available waters.

The trial court found, and such finding has support in the evidence, "that the amount of water which can be applied to beneficial use for agricultural purposes on the lands involved in this litigation is a maximum of 2.5 acre feet per acre per annum[28] * * * to be measured at the point of diversion from the channel of the Rio Grande." Considering the water as may be available to meet the irrigation needs of the area, we are in agreement with the trial court that a plan of weighted priorities will operate with less hardship than a system based upon a strict time priority basis. As stated by that court:

"Under a strict priority allocation, the first priority acreage will receive all water flowing into the reservoir until its full quota would be received. * * * This procedure would result in some land receiving no water for an entire year; in fact records show that since construction of Falcon dam, there would be four years that no water would be received by any acreage other than that of the first priority. * * * Under the weighted allocation procedure, first priority acreage would receive less water than under a strict priority basis. The water not allocated to (the first priority acreage) would go to lower priority acreage. Under this procedure all land would receive water every year."

The trial court also found as a fact that the economy of the lower Rio Grande Valley would be served by the adoption of a weighted priority system. While there are

---

27. The adoption of the appropriation doctrine in the Western States by judicial decision was not accomplished without cries of judicial legislation. Kinney points out that the decisions of the Nevada court in Jones v. Adams, 19 Nev. 78, 6 P. 442, 3 Am.St.Rep. 788 (1885), and Reno Smelting, Milling & Reduction Works v. Stevenson, 20 Nev. 269, 21 P. 317, 4 L.R.A. 60, 19 Am.St.Rep. 364 (1889), overruling Vansickle v. Haines,

7 Nev. 249 (1872), caused an Eastern writer upon the subject (Farnham, p. 2039) to characterize these decisions in a somewhat "hysterical manner" as "one of the most flagrant examples of judicial legislation that was ever perpetrated." Kinney, 2d Ed., Vol. 1, p. 1021.

28. "The standard unit for volume of static water shall be the acre foot." Art. 7539, Vernon's Ann.Tex.Stats.

imaginable circumstances under which strict priority would operate more beneficially than a "weighted priority" plan, we are in agreement with the court below, despite the recognized danger inherent in attempting to predict climatic, meteorological and weather conditions along the Rio Grande in future years. In times of severe drought, public policy calling for efficient and effective use of water as opposed to waste and enforceable under the police power of the state, is available to ameliorate extreme conditions.

Although, so far as we have been able to find, a system of weighted priorities has never been adopted by a court decree, the concept is not entirely new. Frank J. Trelease in his paper delivered before the 1954 Water Law Conference of the University of Texas said (p. 212):

> "Let us suppose a drought with stream flows dropping. Under the system of strict priority, what will happen? Those irrigators with the junior priorities will be cut off from their water supply. Their crops will dry up. Individual ruin may culminate into desolation of an area; perhaps into depression."

See also, White and Wilson, The Flow and Underflow of Motl v. Boyd, The Problem, 9 Sw. L.J. 1, particularly the statements of Elwood Mead and S. C. Wiel, pp. 23–25. Undoubtedly periods of drought will occur along the Rio Grande and while courts have not been too successful in prescribing firm solutions to water problems based upon predictions of the future, we are of the opinion that a weighted system will in all probability entail less hardship in operation than would a plan of strict priority. Under the facts of the present case, we believe the needs of the situation may be best met by adopting two classes of weighted priorities and eliminating certain minor classifications adopted by the trial court. These, we designate as Class A and Class B.

## X.

### Class A (Legal)

This class embraces those who have acquired a right to use waters of the Rio Grande by virtue of having complied with the appropriation statutes of the State or those whose rights have been recognized by the State. In this classification are the following:

1. Those holding under a legal certified filing.

2. Those holding a valid permit to appropriate water issued by the Board of Water Engineers, the predecessor of the Texas Water Rights Commission.

3. Those holding title to a valid appropriation right who are supplied with water under a contract with a water improvement district[29] or water control and improvement district.[30]

4. Those owning or holding possessory rights to lands "adjoining or contiguous" to the canals of a predecessor private irrigation company or those holding possessory rights to lands which are not "adjoining or contiguous" to such canals but nevertheless have a right to be served with water under special conditions. From this classification, however, are excluded those holding claims against a private irrigation company which has been succeeded by a water improvement district rather than by a water control and improvement district.

5. Those whose rights have been specially recognized by the State.

6. Those holding such rights by reason of special situations and unusual circumstances hereinafter mentioned.

It should be noted that under the above classification, all Class I and Class III (insofar as said Class I and Class III claims may have a statutory basis) are grouped with Class II and Class IV claimants and placed in a Class A category. Essentially

---

29. Acts 1917, 35th Leg., p. 17, ch. 87, and amendments thereto. Article 7622, et seq., Vernon's Ann.Tex.Stats.

30. Acts 1925, 39th Leg., p. 86, ch. 25, and amendments thereto. Article 7880–1, et seq., Vernon's Ann.Tex.Stats.

this constitutes a grouping of the trial court's classifications, and the fact that a party having a trial court classification below Class I has not appealed from such award does not prevent his lands from being placed in a Class A classification by this grouping method. For example, Cameron County Water Improvement District No. Seventeen was awarded the right to irrigate 1,525 acres of land in TWC Tract No. C–50[31] by the trial court's judgment and was given a Class II priority because such lands were covered by a legal permit issued after 1913. These Class II lands have been placed in the Class A priority group by this court.

## XI.

### *Class B (Equitable)*

This class embraces those who have been making a good faith use of the waters of the Rio Grande for irrigation purposes prior to the institution of this suit but do not qualify as Class A users. The water districts embrace the greater part of the land ownerships, large and small, lying within the delta area and those entitled in equity to a Class B priority are the owners of lands outside the boundaries of the various water improvement and water control and improvement districts. Many of the declarations relating to water appropriations under the 1895 Act describe or at least identify a greater area of land than that embraced within the boundaries of the districts which for the most part now own the appropriative rights secured under the 1895 procedure. Much of the land not within the districts but in the area sought to be irrigated, according to the appropriators' declarations, borders upon the river or is in close proximity thereto. Such lands

were subject to frequent overflows prior to the construction of flood control works in the Valley and for that reason, were excluded from the boundaries of the water improvement and water control and improvement districts when such districts were organized. As a result of flood control activities, including those connected with the Falcon project, much of the riverside area has been placed in cultivation at a comparatively recent date. Other tracts near the river have been under irrigation for a long period of time. For the most part, these tracts in the immediate vicinity of the river are comparatively small in area and their owners asserted riparian claims for irrigation purposes which were rejected in Valmont Plantations v. State of Texas, 163 Tex. 381, 355 S.W.2d 502 (1962); 346 S.W.2d 853 (Tex.Civ.App.1961).[32] There are other water users whose lands are not within the municipal water districts or riparian to the Rio Grande. They have been securing water from the canals of such districts or by various means. It seems to have been a rather general custom for the municipal districts to furnish water to some lands lying outside their boundaries on a more or less permanent basis. Some of them operated in much the same way as did the private irrigation companies which preceded them. Although they sold water, they did not convey title to the water rights they held under their certified filings or permits. In certain instances, they did sell and convey appropriative rights and entered into contracts with the purchasers, often other districts, to pump and convey water to a point or place of delivery selected by the contracting parties. There apparently is no statutory authority vesting either a water improvement district or a water control and improvement district with authority

31. The tracts involved in this litigation have been numbered according to counties by the Texas Water Commission, the predecessor of the Texas Water Rights Commission. The letters preceding the number refer to the county where the tract is located, i. e. S-Starr, H-Hidalgo, C-Cameron and W-Willacy.

32. Prior to the Valmont decision, it was asserted by some that all lands within grants bordering the river had riparian rights to water. Part of this land in large grants is some distance from the river and is not now under irrigation. Much of it is beyond the watershed of the Rio Grande which in the delta region is extremely narrow.

to sell water generally to the owners of lands outside the boundaries of the district except as permitted by Article 7792 relating to water improvement districts (Chapter 2, Title 128) and Article 7880–138 relating to water control and improvement districts (Chapter 3A, Title 128), which statutory enactments control the sale of surplus waters. Then, as hereinafter specifically discussed, a water control and improvement district may assume contractual obligations of a predecessor irrigation corporation covering "adjoining or contiguous" lands or lands formerly served by the private irrigation company.

In our opinion, if equitable claims are to be recognized at all, no valid distinction can be made between those claimants who relied upon an unfounded riparian claim and those who relied upon a claim based upon a contract to furnish water executed by a water improvement district or a water control and improvement district.

### XII.

### *Special Cases*

As well over a thousand tracts of land are involved in this litigation and the owners thereof assert claims to the Rio Grande waters under a variety of circumstances, it would be impractical to notice all of them in detail. For illustrative purposes, we will discuss those situations which affect a substantial number of tracts and are indicative of the classification priorities adopted by the judgment herein rendered.

(a) "Adjoining or Contiguous" Tracts and Tracts Within the "Area to be Irrigated"

Chapter One of Title 128 of the 1925 Revised Statutes relates to the use of

State water. Articles 7552 and 7555 are a part of said Chapter One and read as follows:

"Art. 7552. Purpose of corporations

"Corporations may be formed and chartered, under the provisions of this chapter, and of the general corporation laws of the State of Texas, for the purpose of constructing, maintaining and operating canals, ditches, flumes, feeders, laterals, dams, reservoirs, lakes and wells, and of conserving, storing, conducting and transferring water to all persons entitled to the use of the same for irrigation, mining, milling, manufacturing, the development of power, to cities and towns for waterworks, and for stock raising." (Repealed, Acts, 1967, 60th Leg., p. 196, ch. 107.)

"Art. 7555. Possessory right

"All persons who own or hold a possessory right or title to land adjoining or contiguous to any dam, reservoir, canal, ditch, flume or lateral, constructed and maintained under the provisions of this chapter, and who shall have secured a right to the use of water in said canal, ditch, flume, lateral, reservior, dam or lake, shall be entitled to be supplied from such canal, ditch, flume, lateral, dam, reservoir or lake with water for irrigation of such land, and for mining, milling, manufacturing, development of power, and stockraising, in accordance with the terms of his or their contract."

While the language of these articles comes from the Act of 1917, the Acts of 1889, 1895, and 1913 contain similar provisions. In Edinburg Irrigation Company v. Ledbetter, 286 S.W. 185 (Tex.Com.App. 1926),[33] these statutory enactments were

---

33. The opinion was written by Judge Nickels of Section A of the Commission of Appeals. The judgments of the Court of Civil Appeals were affirmed in part and reversed in part and the cause remanded to the trial court. The Supreme Court did not expressly approve of the holdings of the Commission as was the usual custom when a remand was ordered. Compare notations, Ledbetter case, 286 S.W.

192, and Schumann v. Brownwood Mut. Life Ins. Ass'n, 286 S.W. 200, l. c. 204 (Tex.Com.App.1926). Both the holdings and the opinion in the Ledbetter case have been criticized. See, R. Richard Roberts, "Problems Connected With the Distribution of Irrigation Water in Texas," 1952 Water Law Conference, p. 79. The opinion contains considerable dicta and it has been said that Judge Nickels wrote in "off

considered and construed. The Edinburg Irrigation Company was a private corporation. The Commission regarded the company as being a public utility and this constituted an important circumstance in the case. The opinion recognized two classes of lands that were entitled to water under Article 7555. As to "adjoining or contiguous" tracts, it was said:

> "As to all lands which are 'adjoining or contiguous' within the meaning of article 7555, the statute provides that the 'possessory' owner's right to have water is an 'easement' which shall 'pass with the title.' In our opinion the right thus denominated an 'easement' exists without regard to a contract between the irrigation company and the landowner, for it is declared (in article 7559) that the owner of 'adjoining or contiguous' land 'shall be entitled to the use of the water upon the terms provided in his or their contract, * * * or, in case no contract is entered into, then at just and reasonable prices and without discrimination.' Other terms of the statute plainly mean that no contract rate or provision may be exacted if it be unjust or unreasonable or discriminatory. Hence each owner of 'adjoining or contiguous land,' with or without a special contract, is entitled, as a matter of statutory right, to demand and receive water upon reasonable and nondiscriminatory terms."

As to lands not "adjoining or contiguous," the opinion continues:

> "The other group of 'persons' (article 7552), i.e. those whose lands are not 'adjoining or contiguous' (article 7555), have the enforceable right to be served under certain conditions. By reason of the situation of their lands in [the] 'area * * * to be irrigated' with the appropriated water (articles 7493, 7509, 7515),[34] they may demand a contract with the corporation for water to be furnished at fair and reasonable charges (and to have water furnished at such 'charges,' if the company declines to contract), if the extent of the facilities then in existence (or to be immediately created) be such as to enable the company, in ordinary conditions, to discharge its duty to those owning (or having 'possessory rights' to) 'adjoining or contiguous' lands, and, also, to furnish the water applied for. * * * Upon the assumption that these corporations will endeavor the good faith performance of all their duties, the Legislature, in this way, left some discretion to them in relation to the question of whether they will, or will not, in a given case, contract with a person who is not the owner of 'adjoining or contiguous' land."

In determining the acreage which fairly comes within the second group of lands mentioned in the Ledbetter case, some difficulty may be encountered as the discretion of the water supplier plays a part in the determination. However, both classes of lands possess rights by virtue of a statute which must be recognized as legal in nature.

The company involved in the Ledbetter case was a private irrigation company classified as a public utility. While most of the irrigated land in the Rio Grande delta was developed under contracts with various private irrigation companies, all of such companies have ceased to operate and have transferred their assets to public water districts of two types, namely, water improvement districts organized under the provisions of Chapter Two, Title 128, Arts. 7622 et seq., Vernon's Ann.Tex.Stats., and water control and improvement districts

---

white" English and his opinions are "not easy to understand." Davenport and Canales, "Texas Law of Flowing Waters," 8 Baylor L.Rev. 138, 283, 1. c. 307 (1956). However, if the Supreme Court has ever expressed dissatisfaction with the controlling holdings of the Ledbetter case upon the points here pertinent, it has escaped our notice.

34. Article 7493 relates to the contents of an application for a permit to appropriate water requiring a "description of the lands proposed to be irrigated." Article 7509 relates to the publication of notice of hearing on application for a permit, and Article 7515 relates to the contents of a permit.

organized under the provisions of Chapter Three A, Title 128, Arts. 7880–1 et seq., Vernon's Ann.Tex.Stats.

There is a statutory distinction between the right of a water improvement district and a water control and improvement district to assume obligations of predecessor private irrigation companies (public utilities). Article 7555 is a part of Chapter One, Title 128, which Chapter authorizes the forming of private irrigation companies and refers to "All persons who own or hold a possessory right or title to land adjoining or contiguous to any dam, reservoir, canal, ditch, flume or lateral, constructed and maintained under the provisions of this chapter," i.e. Chapter One. This necessarily must mean dams, reservoirs, canals, etc. constructed and maintained by corporations organized under the provisions of said Chapter One, i.e., private corporations. Article 7676, which is a part of Chapter Two, Title 128, has been construed as prohibiting water improvement districts from assuming liabilities under contracts made by predecessor private corporations organized under Chapter One of Title 128. Ball v. Rio Grande Canal Co., 256 S.W. 678 (Tex.Civ.App., decided in 1923, wr. ref'd before 1927), Moore v. Meyers, 282 S.W.2d 94 (Tex.Civ.App.1955, wr. ref'd n.r.e.). As to the latter case, it appears that the Supreme Court must have approved the holding of the Court of Civil Appeals upon this point as it was the controlling issue in the case and if erroneous would have constituted an error of substantive law affecting the judgment. Art. 1728, § 6.

The Ball case construed Sec. 40–a of Acts 1921, 1st Called Session, p. 150, which is now Article 7676 of Vernon's Ann.Tex. Stats., and reads as follows:

"No district created or existing or to be created under the provisions of this chapter shall have the right to become a party to or purchase, or hold under or assign or seek to enforce or receive the fruits or benefits from any contract between any land owner and private canal company or corporation made prior to the formation of such district, but all rights and privileges owned or possessed by such district are those arising or inherent in such district by virtue of this chapter. The statutes of limitation of two years as well as the provisions hereof may be pleaded in bar of all actions for the recovery of water rents or other assessments accruing on land in such district prior to the formation of such district and cannot acquire or enforce any lien against such land fixed by any contract existing prior to the formation of such district and cannot prosecute or cause to be prosecuted for it any suit or cause of action or claim of any character for its use for the recovery of any such water taxes or assessments accruing prior to the formation of such district and cannot foreclose any lien on such lands by reason of such unpaid water assessments and taxes accruing · prior to the formation of such district and cannot avail itself of any rights under any private contracts made with reference to said lands prior to the formation of such districts, and cannot be held liable for the breach of any such contract."

On the other hand, the water control and improvement statute (Chapter Three A, Title 128) expressly provides in Article 7880–50 that:

"When a district acquires an established irrigation system which has contracted to supply water to others and the holders of such contracts or the lands entitled to service of water thereon are not within such district, such contracts and duties shall be carried out by the district in the same manner and to the same extent that any other purchaser of such system would be bound thereby."

As a consequence of these statutory provisions, one owning land having the right to water service from a private irrigation company under the Ledbetter case is possessed of a Class A priority, provided such private corporation has been succeeded by

a water control and improvement district. However, if the successor district was or is a water improvement district, a statutory right cannot be recognized.

That group of landowners referred to as the Shary claimants (Allan Shivers, John H. Shary, Inc., Shary Farms, Inc. and others)[35] are representative of those who have a Class A water right or water service right stemming from a contract with a private irrigation company which was succeeded by two water control and improvement districts. These claimants were furnished with water by United Irrigation Company, a private corporation, prior to that company's dissolution in 1952. Hidalgo County Water Control and Improvement District No. Seven acquired certain water rights from United Irrigation Company, the holder of appropriative rights under the 1908 filings of John J. Conway covering lands in the north portion of the area served by United Irrigation Company in Porciones 53–57, Hidalgo County, Texas. Water for said District No. Seven was transported to the district's boundaries through the facilities of United Irrigation Company until 1952. In that year, the United company was dissolved and its assets transferred to Allan Shivers and the pumping and water transporting facilities formerly held by the company were transferred to District No. Seven and Hidalgo County Water Control and Improvement District No. Fourteen, which latter district was organized in 1931 but did not become operative until 1952. Hidalgo County Water Control and Improvement District No. Nineteen covered a land area which was originally intended to be part of District No. Fourteen, but was organized and became operative as a separate district in 1952. While the tracts owned by the above parties mentioned are not within the boundaries of the water districts mentioned, the obligations of United Irrigation Company with regard to these lands have been assumed and are now being carried out by the districts. Such tracts come within the classifications set forth in Edinburg Irrigation Company v. Ledbetter, 286 S.W. 185 (Tex. Com.App.1926). See also, Borden v. Trespalacios Rice & Irrigation Co., 98 Tex. 494, 86 S.W. 11 (1905), Edinburg Irrigation Co. v. Paschen, 235 S.W. 1088 (Tex.Com.App. 1922).

Since the tracts above mentioned have a statutory right to receive water from water districts orgainzed under Chapter 3A, Title 128, Articles 7880–1, et seq., they are entitled to a Class A classification by virtue of Article 7880–50. Such rights are perhaps more accurately described as water service rights because of their connection with the water control and improvement districts mentioned.

(b) Contracts to Furnish Water Executed by Water Improvement Districts and Water Control and Improvement Districts

█ As heretofore indicated, there seems to be no statutory authority authorizing water districts to sell water for the irrigation of lands lying outside the boundaries of the districts other than that given by Articles 7792 and 7880–138. However, many of the water districts in the lower Valley have made numerous contracts with the owners of lands lying without the boundaries of the district. In fact, it seems that some of them have operated upon the theory that they could sell water under the circumstances disclosed in the Ledbetter opinion which involved a private irrigation corporation having certain characteristics of a public utility. These contracts are not uniform in clause or wording. Those

---

35. These claimants are:
Allan Shivers (Court No. 975, TWC Nos. H–501–506); Shary Farms, Inc. (Court No. 971–a, TWC No. H–277); John H. Shary, Inc. (Court No. 971, TWC Nos. H–487–497); Southtex Land Sales, Inc. (Court No. 1006, TWC Nos. H–514–515); Arnold J. Shary (Court No. 970, TWC No. H–486); Richard Hatch (Court No. 509, TWC No. H–246); George Hersh (Court No. 521, TWC No. H–255); Peter Cornelius (Court No. 229a, TWC No. H–113a); and John B. Hardwicke, et al (Court No. 506, TWC No. H–330).

executed by Hidalgo and Willacy Counties Water Control and Improvement District No. One are perhaps more readily recognized as water surplus contracts than those executed by some of the other districts. Yet, these Willacy contracts, which are brought before us on appeal, were executed under special circumstances and are of many years standing. Willacy County (now Hidalgo and Willacy Counties) Water Control and Improvement District No. One as originally established embraced a much greater territory than it does at the present time. The district held the legal title to Permit No. 1110 which embraced all of the territory originally within the district. In 1941, the district carried out an exclusion program in order to qualify for financial assistance from the Public Works Administration and was reduced from an area of 129,000 acres to approximately 75,000 acres. The basis for this reduction in size and the exclusion of some 54,000 acres therefrom was the inability of the district to irrigate the excluded lands. See Baugham v. Willacy County Water Control and Improvement District No. One, 112 S.W.2d 318 (Tex.Civ. App.1938, wr. ref'd). These excluded lands, however, remained subject to their pro rata share of the district's bonded indebtedness for the period of time they had been in the district. Despite this exclusion, it was found that a portion of such land could be irrigated by raising canal levels and contracts were executed with various landowners to furnish irrigation waters. These agreements, brought to our attention by landowners who have appealed, undoubtedly contemplated a rather permanent arrangement; some of them provided for the construction of storage facilities, but all of them made the actual delivery of water subject to the discretion of the Water Master of the district and the demands of irrigators of lands within the district. It appears that subsequent to the filing of this suit and the trial court's action in taking judicial custody of the American waters of the Rio Grande, there were in some instances additional contracts executed by the district which, so it is contended, operated to vest a legal title to a water right in some of the Willacy County claimants. Because these contracts or purported conveyances were executed pendente lite, we cannot recognize them as forming a basis for an equitable claim or raising an equitable claim to a legal status.

■ All claimants of rights under contracts with the Willacy County District were denied water rights or water service rights and were classified as "surplus water" claimants whose rights were not adjudicated by the judgment.[36] However, in numerous instances, it was decreed that tracts of land receiving water under and by virtue of contracts with other water districts were entitled to water rights. This was apparently done upon the theory that such tracts were included in the area to be irrigated within the concept or contemplation of a certified filing, or that they had been irrigated prior to the ratification of the Rio Grande, Colorado and Tijuana treaty in 1945. For the reasons heretofore stated, we have rejected the proposition that one could have a water right of the first class without having some connection with the legal title to an appropriative right. We have also disapproved of the treaty classification as the treaty did not operate to vest water rights in anyone.

36. The "Decision" portion of the judgment contains the following relating to surplus water contracts:

"The so-called 'surplus water' contracts granted by some irrigation districts created a contractual relationship between such district and the present holder in such 'surplus water' contract, and the rights as between such contractual parties is hereby severed from this cause of action, and not passed upon by this Court except to hold that the owner of such 'surplus water' contract has failed to establish any legal right to the use of water of the American share of the Rio Grande. The Court is unable to define 'surplus water' and does not attempt in this proceeding to adjudicate the relationship of such parties. They are severed and left to such recourse as may be available to them."

When we consider the recognition of equitable rights or classifications, we have two classes of claimants, namely, (a) those who have in the past claimed a riparian right to irrigation waters, and (b) those who claim the irrigation right by reason of a contract with a water district. Neither class has a connection with the legal title to an appropriative right [37] and in principle, there should be no distinction between them. One class claimed under a right declared nonexistent in the Valmont case while the other class claims under a contract with a water district which ordinarily would not be construed as giving rise to any form of a water or water service right. In the absence of the unusual and extraordinary circumstances of this case heretofore detailed, neither form of claim, reparian or contractual, could be recognized. It further seems impractical to attempt a distinction between contracts held by appellants with the Hidalgo and Willacy Counties Water Control and Improvement District No. One [38] for a long period of time and those executed by other water districts. For example, it appears that for some thirty years, Hidalgo County Water Control and Improvement District No. One has supplied water under contract with F. H. Vahlsing Co., Inc. for a tract of land in the Santa Cruz Tract in the northern portion of Hidalgo County. The contracts under which this water was delivered expressly provide that:

"It is further distinctly understood and agreed that since First Party (the water district) is organized and operating as a water control and improvement district under and by virtue of the laws of the State of Texas, this contract is expressly made subject to all of the terms, restrictions, limitations and provisions of the laws of the State of Texas with reference to the delivery or supplying of water to lands outside of said District, such as the land of Second Party (Vahlsing) is; and Second Party well understands that First Party is obligated under the laws of the State of Texas, and of its organization, first to supply water to the water-users within the boundaries of its own District, and that it can only sell and deliver to Second Party such surplus water as it may have after supplying the needs and requirements of the water-users whose lands lie within its own boundaries."

We hold that those who have filed appeals herein whose lands were originally within the district and who hold contracts with the Willacy County District, are entitled to a Class B priority. Those holding under similar contracts with other districts are entitled to like treatment, provided they have properly asserted their rights on appeal.

### (c) Right of Way Contracts

It appears that in a number of instances, both water improvement districts and water control and improvement districts have entered into right of way contracts with owners of land lying outside the particular district. These agreements provide that the district will furnish water permanently for the irrigation of a certain acreage or a definitely described tract of land in consideration of the conveyance of a right of way for the construction and maintenance of one or more of the district's canals or facilities. The situation of St. Louis

37. This discussion does not relate to tracts of land served at one time by private irrigation companies which have been succeeded by water control and improvement districts; nor does it relate to "right of way contracts" a matter hereinafter examined.

38. The claimants under contracts with the Willacy district who have appealed are: C. N. Howard (Court No. 566, TWC No. W-47); S. P. Nielsen (Court No. 762, TWC No. W-66); Gustave Ring—Teniente Water Improvement District No. One (Court No. 892, TWC No. W-73); James G. McBride, James L. McBride, McBride Farms, Mary R. McBride (Court No. 678, TWC Nos. W-61, W-62, W-63); W. Frank Renfrow (Court No. 873, TWC No. W-72); J. H. Harbin (Court No. 504, TWC Nos. W-38, W-39); and Mildred Y. Harbin (Court No. 505, TWC No. H-243).

Groves Irrigation Company (Court No. 1022, TWC No. H–525) is illustrative. The trial court's judgment placed 403.23 acres of TWC No. H–525 in the Class III (Treaty) category. The Statement of Facts discloses that in 1924, Ramon Vela was the owner of 250 acres of land in the Ejidos de Reynosa Viejo, which 250 acres now constitute a part of TWC No. H–525. On August 30, 1924, Vela conveyed to Hidalgo County Water Improvement District No. Four (the predecessor of Hidalgo County Water Control and Improvement District No. One) "a permanent right of way for pumping plants, canals and laterals for irrigation purposes on, over, through, under and across" four tracts of land specifically described by metes and bounds aggregating a total of 40.30 acres. The consideration recited in this conveyance was "the agreement by Hidalgo County Water Improvement District No. Four to furnish me (Vela) a sufficient amount of water to irrigate two hundred and fifty acres of land belonging to me, situated in what is commonly known as the 'Ejidos de Reynosa Viejo Grant' in Hidalgo County, Texas." The deed also contained a provision binding Vela to pay for the water furnished him "at the same rate that the landowners within the District are required to pay for such water. * * *" This water service right acquired by Vela was transferred to Lee Akin insofar as 200 acres were concerned. Later, Akin by agreement with the district located his 200 acre water service right on the north 200 acres of Lot 389 of a partition of the Ejidos de Reynosa Viejo. Akin also entered into contracts with the district to furnish water for irrigation purposes for some additional acreage. A 1943 agreement introduced in evidence indicates that insofar as this additional acreage was concerned, the contract had the characteristics of a surplus water contract. However, it contained a recitation or provision that:

"Second Party (Lee Akin and associates) desire it understood that the usual and customary provisions applicable to users of irrigation water under surplus water contracts shall not affect their asserted rights concerning irrigation water herein contracted for and to be supplied and used on the North 200 acres of Lot 389, Los Ejidos de Reynosa Viejo grant, to which acreage Second Party assert they have all of the rights to receive water on 200 acres of land given them by and under the assignment dated March 26, 1943, from Raul Vela and Rodolfo Vela, of the original rights, if any were so given, by Hidalgo County Water Improvement District Number Four, predecessor of First Party herein on August 30, 1924, to Ramon Vela in a certain easement and right-of-way conveyed by the last named to said predecessor for its canal near Penitas."

The Akin lands and contracts with the water district were later acquired by St. Louis Groves Irrigation Company and in 1956 the Akin agreement was extended for a period of 99 years. In our opinion, St. Louis Groves Irrigation Company is entitled to a Class A priority for the north 200 acres of Lot 389 of the Los Ejidos partition and a Class B priority covering the remaining 203 acres in TWC No. H–525.

Undoubtedly, a water improvement district or a water control and improvement district has authority to acquire rights of way for canals, laterals and pump sites over lands lying outside the boundaries of the district. It is the nature of the consideration paid for the right of way that presents difficulty. In this particular instance, it appears that the pump sites of the district and the right of way of its Penitas main canal were obtained through an agreement to furnish certain lands with irrigation waters and that shortly after such contract was made, water was actually furnished to the designated tract. The acreage to be irrigated had been distinctly specified and the water service right received was not out of proportion in value to that of the easements conveyed. The claim asserted is based upon the right of way contract and not on a surplus water contract. This arrangement may

be considered irregular, but it is not void. If it be subject to rescission, no steps toward that end have been taken. In this situation, we think St. Louis Groves Irrigation Company is entitled to a Class A priority for 200 acres of its lands. ·

### (d) Valley Acres Water District [39]

The Valley Acres district was created as a water control and improvement district by an act of the 52nd Legislature and is codified as Article 8280–143, Vernon's Ann.Tex. Stats. The district asserts ownership to a valid subsisting appropriative right covering 9,000 acres of irrigable land within its boundaries under Certified Filing No. 27, originally held by American Rio Grande Land and Irrigation Company. While the territory now occupied by Valley Acres was within the certified filing, it was not developed by the American company although one of its canals did extend to what is now the boundary of the Valley Acres district. The trial court awarded a Class V (Falcon) priority for 9,000 acres of land within the district. No water right was given to 1,202.58 acres, and no complaint is made of this latter action.

The trial court in special findings and conclusions relating to this tract concluded as a matter of law that:

"[T]he failure on the part of the American Rio Grande Land & Irrigation Company and its successors in title to the lands now within Valley Acres Water District to irrigate said lands with waters diverted from the Rio Grande pursuant to said appropriative right, if any, until the summer of 1946 resulted in the abandonment, loss or forfeiture of said appropriative right, if any."

Valley Acres argues that the court set an arbitrary period ending in 1940 as a test of reasonable development. However that may be, we think the crucial issue here relates to "abandonment" as the court below also found as a fact that:

"[T]he water rights originally acquired by American Rio Grande Land & Ir-

rigation Company pursuant to its 1906 declaration as now asserted by Valley Acres Water District as applicable or appurtenant to the lands within said District were never cancelled or forfeited by action of the State Board of Water Engineers or the Texas Water Rights Commission and no such proceedings were ever instituted by either the State Board of Water Engineers or the Texas Water Rights Commission."

If, despite a severe economic depress, the bankruptcy of the American company, the 1933 hurricane which visited the area and the Second World War, there was some unnecessary delay in developing the Valley Acres tract, there was no abandonment. There is a marked distinction between a forfeiture for noncompliance with the terms of a privilege or an inchoate right and an abandonment.

Kinney states that:

"Although the terms 'abandonment' and 'forfeiture' are oftentimes used interchangeably, even by the courts, upon the subject of the loss of water rights, and other rights used in connection therewith, there is a decided distinction in their legal significance, and one which, in view of the forfeiture clauses enacted by recent legislation, should be observed. While, upon the one hand, abandonment is the relinquishment of the right by the owner with the intention to forsake and desert it, forfeiture, upon the other hand, is the involuntary or forced loss of the right, caused by the failure of the appropriator or owner to do or perform some act required by the statute. Forfeiture is a 'punishment' annexed by law to some illegal act or negligence in the owner of the lands, tenements, or hereditaments, whereby he loses all his interests therein." (Kinney on Irrigation and Water Rights, 2d Ed., p. 2020)

In Hidalgo County Water Control and Improvement District No. One v. Goodwin, 25 S.W.2d 813 (Tex.Com.App., holdings approved by the Supreme Court 1930), it

---

39. Court No. 1082, TWC No. H–549.

was asserted that the water district had lost its water rights to certain lands because of is failure to exercise such rights by putting water to a beneficial use upon such lands. The Commission said:

"It is contended by the defendants that if plaintiff ever had any water right, with reference to the lands in porciones 48, 49, 50, 51, and 52, that they have been forfeited and if they are mistaken in that contention that the plaintiff has lost whatever water rights they may have ever had by reason of non-use and abandonment. It is undisputed that no one representing the state has undertaken to forfeit or cancel the water rights held by plaintiff under the Laws of 1895, 1913, or under any other acts pertaining to irrigation. Forfeitures generally are not favored by law, and the laws relating to irrigation are liberally construed and given such effect as to best promote irrigation and thereby carry out the purpose of the Legislature. Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S.W. 575, Ann. Cas.1914B, 322." [40]

The facts of City of Anson v. Arnett, 250 S.W.2d 450 (Tex.Civ.App.1952, wr. ref'd n.

40. Articles 7474 and 7519, Vernon's Ann. Tex.Stats., taken from the Canales Act of 1917, provide:

"Art. 7474. Forfeiture of rights

"Neither the foregoing article, nor any other provision of this chapter, shall be construed as intended to impair or to work or authorize the forfeiture of, any rights heretofore or hereafter acquired by any declaration of appropriation or by permit when the appropriator has begun, or begins, the work and development contemplated by his declaration of appropriation, within the time provided in the law under which the same was or is made and has prosecuted and continues to prosecute the same with all reasonable diligence toward completion; but if any appropriator under this chapter, or other law of this State, has failed or fails to begin the work and development contemplated by his declaration of appropriation within the time provided in the law under which the same was or is made, or has failed or fails to prosecute the same with all reasonable diligence toward completion, his right to so much water as has not been applied, or is not applied to beneficial use, as defined in this chapter, shall be considered as, and shall be, forfeited, and such water shall be subject to new appropriation under this chapter; provided, that no such rights shall be declared forfeited until the person or persons who are the owners of the land and whose rights are claimed to have been forfeited, shall first be given due notice and hearing, as required in Article 7519 of this chapter; and, provided further, that if a permit for the use of such water has been issued, or is issued, under this Act, or under the Act approved April the 9th, 1913, such water shall not be subject to new appropriation until the permit is cancelled by the Board in whole, or in part, in accordance with the provisions of Article 7519 of this chapter.

"Art. 7519. Time required

"Within ninety days after the date of issuance of the permit provided for in this chapter, the applicant seeking to appropriate water thereunder shall begin actual construction of the proposed ditch, canal, dam, lake, reservoir, or other work, and shall prosecute the work thereon diligently and continuously to completion; provided, that the Board may, by an order entered of record, extend the time for beginning the actual construction of such work for a period not to exceed twelve months from the date of issuance of such permit; and, further provided, that if any applicant shall fail to comply with the requirements of this article, he, they, or it, shall thereby forfeit all rights under such permit. If any applicant to whom a permit is issued, or one owning prior appropriation, shall, after beginning the actual construction work, as provided in this article, fail to thereafter prosecute the same diligently and continuously to completion the Board may, after thirty days notice to the applicant or owner of such appropriation, and giving him an opportunity to be heard, by an order entered of record, revoke and cancel such permit or appropriation in whole or in part. Any party affected by such order shall have the right of appeal to the district court, as in this chapter provided. A certified copy of such order shall be forthwith transmitted by the secretary of the Board, by registered mail, to the clerk of the county in which such permit is recorded and which order shall be recorded by said county clerk."

r.e.), presented a somewhat similar question to that here involved. The court said:

"Art. 7544, Vernon's Revised Texas Statutes (originally Section 46 of the Irrigation Act of 1917) provides: 'Any appropriation or use of water heretofore made under any statute of this State, or hereafter made under the provisions of this chapter, which shall be wilfully abandoned during any three successive years, shall be forfeited and the water formerly so used or appropriated shall be again subject to appropriation for the purposes stated in this Act.' * * *

"An essential element of abandonment is the intention to abandon and such intention must be shown by clear and satisfactory evidence. Abandonment may be shown by circumstances but the circumstances must disclose some definite act showing intention to abandon. The non-use of a right is not sufficient of itself to show abandonment but if the failure to use is long continued and unexplained, it gives rise to an inference of intention to abandon. 1 C.J.S. Abandonment § 7, p. 16; 56 Am.Jur., p. 762; 1 Tex.Jur., p. 12; 22 Tex.Jur., p. 87; La Brier v. Williams, Tex.Civ.App., 212 S.W.2d 828; Armstrong v. Neville, Tex.Civ.App., 117 S.W. 1010, 1012; Odum v. Menafee, 11 Tex. Civ.App. 119, 33 S.W. 129; Cline v. Upton, 56 Tex. 319; Sanders v. Sheran, 66 Tex. 655, 2 S.W.2d 804; Foreman v. Meroney, 62 Tex. 723."

Although the evidence in the case disclosed that the city did not repair a dam for some six years or use more than fifty cubic feet of water for such period, an abandonment was not shown. The court said:

"The facts do not show a willing failure to use any of the water but only a failure to use more than fifty acre feet because of the broken dam, which was not caused by Arnett. There is no showing that it would have been to the financial advantage of Arnett to repair the dam during said period. It was not shown that Arnett was in financial condition to have repaired the dam before it was repaired in 1951. The failure to repair the dam under such circumstances when there was no evidence of any particular need for or benefit to result from an immediate repair does not raise an inference of intention to abandon. Hall v. State, 72 App.Div. 360, 77 N.Y.S. 282; Dallas County v. Miller, 140 Tex. 242, 166 S.W. 2d 922. At most, the evidence does no more than arouse a mere surmise or suspicion that Arnett intended during a period of more than three years, to never repair the dam and thereby impound more water. No fact issue for jury determination was presented. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063."

It further appears in the present case that the Board of Water Engineers in carrying out its duties as an administrative agency has taken the position that the Valley Acres district possessed a valid water right. The Board is enjoined by statute "to investigate and report upon the organization and feasibility of all districts which shall issue bonds under the provision hereof. * * *" The Board of Water Engineers has approved a bond issue of the Valley Acres district and has construed similar actions as embracing a finding that a district possessed a valid water right. While this administrative construction and the necessary implication that there has been no abandonment of a water right is not binding upon the courts, it is nevertheless persuasive and should not be lightly disturbed. In our opinion, there has been no abandonment of the appropriative water right covering the Valley Acres area, and we accordingly conclude that the district is entitled to a Class A priority.

## Conclusion

The judgment rendered by the court below is modified in the particulars above indicated and such judgment as modified is affirmed.

GREEN, C. J., and NYE, J., participated in the preparation of the above opinion and concur therein.

## On Motion for Rehearing

We have considered the numerous motions for rehearing filed herein. Certain errors in the original judgment relating to particular parties and tracts have been pointed out to us and rehearing is granted to the extent of correcting such errors. As to the main question involved upon this appeal, i. e., the recognition of equitable water rights (Class B rights), we adhere to our holdings expressed in the original opinion, both as to those asserted by riparian claimants and those asserted under water contracts with municipal districts within the area. It has been argued with great force and ability that neither class of such rights should receive judicial recognition. Our reasons for recognizing such claims are based upon the unprecedented situation disclosed by the record before us. This matter has been fully discussed in the original opinion. Upon original submission, it was argued by some that the trial court's judgment would in operation favor riparian over contract claimants. To some extent, we believe this is true. In our opinion, if equitable claims are to be recognized at all, both classes of claims should be treated equally insofar as it is possible to do so. Many equitable claims based upon contracts present questions which are admittedly close, and we have determined the good faith issue by the contract itself and the probable intended extent of the agreement as disclosed by all the surrounding circumstances of the parties, together with the general irrigation history of the area,—the early formation of private irrigation companies, the practices developed by them and their ultimately being superseded by the statutory municipal districts. We have undoubtedly given recognition to some practices which were not illegal, but might have been subject to a more stringent administrative control. Non-action on the part of the state administrative agency subsequent to the recognition of a certified filing or

the granting of a permit is a factual circumstance of the case as pointed out in the original opinion. This condition has persisted until recent years when the water situation along the lower Rio Grande became so acute that action became imperative.

■ We should also say that we find nothing in the nature of reversible error either in the trial court's recognition of water rights in certain persons who entered no appearance herein, or in awarding certain water rights to non-incorporated villages. Every effort was made by the trial judge to secure the appearance of all those having an interest in lands lying outside the municipal water districts. (The owners of lands within the districts were virtual parties being represented by the districts.) The present suit possesses many characteristics of a class action and in those instances where the evidence introduced showed that a party who had not appeared as requested by the trial judge, and whose land did not lie within a water district, was never the less entitled to a water right, it was not, in our opinion, error to so say in the judgment. If the rights so awarded, which generally relate to small tracts of land, are not exercised, then the situation is not without remedy under the Water Rights Adjudication Act.

It should further be pointed out that this suit does not purport to adjudicate riparian rights to water for domestic as contrasted with irrigation and similar uses. See, Valmont Plantations v. State of Texas, 163 Tex. 381, 355 S.W.2d 502 (1962); 346 S.W. 2d 853 (Tex.Civ.App.1961). For that reason, we refrain from discussing such claims as are mentioned in the briefs and motions filed herein.

There is one matter raised by the motions which calls for additional writing. We are requested in the language of the motion filed herein by Donna Irrigation District, Hidalgo County No. One, and others to clarify our position "regarding retention of jurisdiction in the trial court to change

rights adjudicated and administration of the right adjudicated herein after the appeal becomes final in this case." Because of the prior opinion of this court in State v. Starley, 413 S.W.2d 451, handed down on March 9, 1967, and the passage of the Water Rights Adjudication Act, Acts 1967, 60th Leg., p. 86, ch. 45, Article 7542a, Vernon's Ann.Tex.Stats., which became effective on August 28, 1967, we were of the opinion that it was not necessary for us to discuss this matter. However, in the motions it is pointed out that "if the present court-appointed water master's system does not continue, then additional time must be allowed for the necessary transition to some other administration."

In State v. Starley, supra, this court held that the judgment rendered by the Hidalgo County District Court (from which the present appeal is prosecuted) was a final appealable judgment despite the provisions contained therein relating to the administration and enforcement of the water rights recognized by the judgment. It was said that, "The (trial) court 'may enlarge or abrogate or modify from time to time any portion or feature of the decree' so long as such is confined to the 'administration, allocation and distribution of the water' in accordance with the adjudicated rights determined by the court. All other language in the judgment in conflict with the laws of this state would be surplusage."

▆▆▆ After the rendition of this opinion, the Water Rights Adjudication Act became effective and Section 8 thereof authorizes and enjoins the Texas Water Rights Commission to administer adjudicated water rights. The term "adjudicated water rights" embraces those adjudicated in a judicial as well as an administrative proceeding, and the Act is, therefore, applicable to the waters of the Rio Grande and so far as administration is concerned, such Act supersedes the administrative procedure set forth in the judgment rendered herein. Any power which under the wording of the judgment might remain in the trial court to enlarge, modify or abrogate any right recognized by the judgment is likewise superseded by the provisions of the Water Rights Adjudication Act. Section 10 of the Act recognizes that the Texas Water Rights Commission has the power under general law to forfeit, cancel or find abandoned any water right, including adjudicated water rights. Such power is, of course, to be exercised in accordance with the constitutional precepts enjoining due process of law. As to forfeiture of water rights for willful abandonment, see Article 7544. There may be other grounds for forfeiture or modification of water rights, either explicitly stated in our statutes or impliedly inferred therefrom and applicable to those situations in which non-compliance with or violation of a statutory or administrative directive takes place. The processes under which such forfeitures or loss of rights are to be effected, initially at least, will be under the control of the Texas Water Rights Commission.

We recognize the force of the argument that a period of time of some duration is required to effect a change-over from control by court appointed administrative officials and employees to control by those selected by the Texas Water Rights Commission and for that reason have granted that portion of motions for rehearing raising this matter to the extent of specifically providing in the judgment that unless further extended by this court or the Supreme Court of Texas for good cause shown, the Texas Water Rights Commission shall assume control and administration of the water rights herein adjudicated sixty days after the judgment rendered herein shall have become final, and that thereafter the right of control and administration heretofore exercised by those officials and employees appointed and selected by judicial authority shall terminate.

To the extent indicated, the motions for rehearing are granted. In all other respects, they are overruled.

Motions for rehearing granted in part and overruled in part.